L. F. GRAY, RESPONDENT, v. BERTHA M. LEVY, APPELLANT.—48 S. W. (2d) 20.

Kansas City Court of Appeals. February 29, 1932.

*Kennard & Gresham* and *W. W. McCanles* for respondent.

*Hackney & Welch* for appellant.

BOYER, C.—Action *ex delicto*. The parties will be referred to as plaintiff and defendant as designated below. Plaintiff sued defendant and her husband, Leo Levy, to recover damage on account of personal injury received by him when he fell into an elevator shaft from the lobby of the Glennon Hotel in Kansas City, then operated

by defendant. The pleadings are unquestioned. The petition alleged among other acts of negligence that defendants negligently "permitted the door leading into said elevator to be open when the elevator was not at said floor level, all of which was reasonably likely to cause plaintiff and others to be misled to step into said elevator shaft in an effort to take passage on the elevator;" and that defendants were further negligent in that "they had said door to said elevator open when said elevator was not at said floor level and failed to have any light or reasonably sufficient lights showing the outlines of said elevator shaft to enable plaintiff to determine whether or not said elevator was at said floor level." The substance of these two charges of negligence was submitted to the jury in an instruction for plaintiff requiring a finding thereon and that plaintiff was injured as a direct result thereof while in the exercise of ordinary care.

The separate answer of Bertha M. Levy was a general denial and a sufficient plea of contributory negligence. It alleged that plaintiff's injuries were caused solely by his own negligence in failing to use ordinary care and that he negligently stepped into said elevator shaft without looking to see if the elevator was there and without first ascertaining whether he could enter said elevator shaft in safety, and that plaintiff knew or by the exercise of reasonable care could have known that the elevator was not even with the floor and that he could not enter the shaft with safety.

At the conclusion of the evidence offered by both sides, defendants requested peremptory instructions in the nature of demurrers to the evidence. They were refused and the case was submitted to the jury on instructions given at the request of both sides. The verdict was for the plaintiff and against both defendants in the sum of $4500. Judgment followed and defendant Bertha M. Levy alone perfected her appeal. The points presented in the assignment and brief are (1) that the court erred in failing to sustain the demurrer at the close of all the evidence, and (2) that the court erred in giving plaintiff's instruction No. 1. Defendant asserts that the demurrer should have been sustained because under the evidence plaintiff was guilty of contributory negligence as a matter of law. Plaintiff contends to the contrary, from which arises the prime question for determination in this case. A search for the facts and permissible inferences favorable to the plaintiff is required. We have duly examined the abstract and state the pertinent facts as follows:

Plaintiff was injured March 7, 1929. Then and prior thereto defendant Bertha M. Levy owned the lease and the furniture of the Glennon Hotel, and at the *locus in quo* conducted a public hostelry. The entrance from the south led to a spacious lobby about forty feet long and twenty-eight feet wide. Along the west wall and extending to the north end of the lobby were located consecutively the desk

or hotel office, switchboard, mail box, elevator, fountain, check room, and private office. The main ceiling was about twenty feet high, but there was a messanine nine feet wide on each side. There were numerous light fixtures suspended from the main ceiling and in the ceiling under the messanine. One was located about a foot above and two feet away from the top of the elevator door. This door was built in three upright sections, each two feet wide. The section on the north, or right-hand side of one looking at it, was stationary; the other two were movable. They rested on bearings and could be rolled back behind the stationary part. This was the entrance through which one would pass to get on the elevator, and when the door was completely open it was four feet wide. The sections of the door held panels of glass with meshes of wire. The glass extended from near the top of the frame to within eighteen inches of the floor. The elevator carriage always had lights in it and when it stopped at the lobby floor it was visible from the lobby, whether the doors were closed or open. There was no light maintained in the elevator shaft below the lobby floor.

On the day named, plaintiff was, and for two weeks, had been a guest at the hotel. He occupied a room on the fourth floor and was accustomed to use the elevator several times each day. It was operated by different bell boys, a number of whom were employed by defendant. They were all experienced operators and would alternate every two or four hours in running the elevator. When the elevator would ascend from the first floor the boy operating it would push the movable part of the door to close the entrance; the south panel of the door was equipped with a latch which would catch and hold the door closed when in working order. The latch was out of order and sometimes failed to catch thereby leaving the door unfastened or partly open. When the latch did not hold the door would sometimes rebound a variable distance, depending upon the degree of force applied when it was pushed by the operator. Such in brief and general outline were the facts, conditions, and circumstances prevailing at the hotel on the day and at the time of plaintiff's injury. Other specific facts relevant to the issue of contributory negligence will be given in detail.

Plaintiff testified that he was fifty-three years of age, five feet, eight inches tall, and weighed 185 pounds; that his room was on the fourth floor of the hotel and that he had been staying there about two weeks; that the elevator was located north of the desk on the west side. He supposed the lobby was from sixteen to twenty feet wide and from thirty-five to forty feet long; that he was accustomed to use the elevator; he judged the door when open was about four feet wide; he had never stopped to measure it and was only guessing. He thought the elevator had two doors; he thought they opened back

to the north and supposed that the elevator was customarily operated by the bell boys; that they were dressed in uniforms bearing the name of the hotel; the operator generally stood back to the right and generally kept the door open if he was waiting to take passengers up. Plaintiff further stated that he went into the hotel on the evening of March 7th, about a quarter past six. He was a cow buyer and had been out in the country looking for cows; he had been in previously and went out to get a grip which he had left in his car and which contained instruments, or tools as he described them, which were used in the pursuit of his business, and in describing what he did upon his return, said: "I was coming along carrying my grip. I walked back, I saw the elevator boy standing there where he stood many times. I mean east; right to the corner of the elevator; east side. I walked in there and he was standing there looking like he was looking at the elevator, only standing there with the elevator door open, and I just walked up and went right into it, and I fell and my foot hit this here door, probably did, probably made a racket, and when I stepped in of course I naturally grabbed for something, you would be bound to grab for something, but I never got hold on the door and I went to the bottom." He did not know how far he fell, but supposed sixteen or eighteen feet; that he could easily be wrong; it was the length of the basement and then down four or five feet further; he had his grip in his left hand; when he stepped in the elevator shaft the door was open about two feet. "I would not say exactly, because it was open just about what it was when a person walked into it." He had gone in many times before and did not notice any difference; the elevator was not there; an elevator boy stood right there close in the lobby; there was no light down in the elevator shaft. After he fell he was assisted to his room and was later removed to the hospital. He testified to the nature of his injuries, treatment thereof, and the time spent in the hospital. After he had been in the hospital about seven days a girl and two men came to see him; he was asked questions and made answers; he did not send for them; he did not sign anything and they did not leave a copy of what they claimed he said.

On cross-examination, plaintiff said that he answered a few questions when the parties called to see him at the hospital; that the girl had a paper and he supposed she was writing; he did not know what they asked him and he didn't know what they got on the paper; he supposed he answered the questions truthfully; that he was trying to; that his pain and suffering had nothing to do with answering their questions truthfully; one of his attorneys had already been to see him; that the bell boys all looked alike; there were five or six of them; that when he waked back to the elevator the bell boy was standing right by the elevator door looking out the lobby window; he

seemed to be looking toward the street south; "I don't think he ever saw me." He later said: "I think he was looking at me;" and again, "I think he was looking out the window." Witness did not suppose he was looking at the elevator. The boy was looking out the window. Witness said: "I don't think he was doing anything else. He was right up here close by the elevator." He was then asked if the boy was leaning against the wall, and answered: "No, he wasn't leaning against nothing only he was leaning against a chair or something like that; leaning against a desk or a chair behind the desk, leaning over something like that." The elevator was on the west side and back part of the lobby, and it was about two feet from the north wall, but he was guessing. The elevator boy was standing something like two feet from the north wall; he did not know that there was anything between the elevator shaft and the north wall; he did not remember the drinking fountain nor the check room; he might have gone in four or five times a day; he figured there were two sections to the door; that is all he ever noticed; each section was about two feet wide, but he never noticed; that there were two doors on it; that he supposed there would be a four foot space when the doors were completely open; that he was carrying his grip in his left hand; that there was an electric light in the elevator car; it was a dim one; he did not remember, but if there was one there it was dim. He was asked if he was in a hurry and said: "Well, I wasn't in such a hurry after all; but I was just going down practically." He denied the answers shown in the statement taken at the hospital in which he said that he went down to the car in a hurry, as well as his answer that the door was open about eighteen inches, and said that he would judge that it was around two feet. "It was open enough for me to get into." "If I had stopped to measure it I would never have went in there." "I would have found out there was no elevator there." "Because the door was open I decided they was waiting to take me up." And this question and answer: "Q. *So you didn't look before you stepped in there?* A. *Why, no; I didn't look before I stepped in there.*" He denied that he had stated that the door was open about eighteen inches, and that he pushed it open a little further, as well as his answer that there was sufficient light. One of the questions propounded and the answer made at the hospital was: "Q. As you walked through the lobby toward the elevator did you have any trouble seeing where you were going? A. No." Witness said: "That is all right." He also said: "If there had been a light in the elevator it might have been different." And that he probably said in answer to a question: "I am a fellow who is not one to notice;" and that the door was open about half way, about two feet.

He further stated on redirect examination that just as he was stepping in the elevator shaft he was looking west; that he did not

notice any difference; that the bell boy was about two feet from him and never said a word. On further cross-examination was this question and answer: "Q. Well, in stepping into an elevator shaft through a door that is only half open, without looking at all, has it ever occurred to you that you were at fault? A. Well, I think if it was to do over again, a person would do the same thing. I don't see nothing preventing any person from doing the same thing I done before."

Plaintiff called Fred Thompson, a former employee of defendant who was acting as one of the bell boys at the time plaintiff fell. He described the surroundings in the lobby heretofore given. He had been employed about two years and had operated the elevator many times; that the custom was to leave the door wide open when the elevator was on the first floor; that there was a latch on the door and sometimes it failed to catch; that when the door was completely open it was four feet wide; that at the time of plaintiff's injury he was standing about ten feet east of the elevator, facing south; that one of the other boys was standing near the elevator shaft; he did not see plaintiff fall, but heard a commotion, turned to look, and the man was falling down the shaft; he saw his hand grab for the door; the door was open about two feet; there was no light in the elevator shaft; he didn't know whether the other boy who was standing near the elevator had on his uniform; he worked on the other watch and witness worked on the watch that was coming on.

On cross-examination he said that the other boy was standing beside the elevator and check room door, out in front of the check room door and directly east of it. He also said the boy was standing by the check room and by the fountain. It was light in the elevator and when it was at the floor the light was plainly visible from out in the lobby, and the lobby was well lighted; that when he heard the commotion the man grabbed the door and started to fall; the door was rattling and sounded like it was moving; he was looking to the south and when he turned, the elevator door was then about two feet open and still moving.

There were no other eyewitnesses to the accident called by the plaintiff and he relies upon the foregoing testimony to establish a submissible case and claims that it exempts him from the charge of contributory negligence.

Defendant offered numerous witnesses and much evidence, none of which would aid the plaintiff, but on the contrary is to the effect that plaintiff hurriedly entered the hotel, walked rapidly to the elevator door, which was not perceptibly open, took hold of it, shoved it back, and stepped into the elevator shaft. Numerous statements made by plaintiff were shown in evidence to the effect that plaintiff was in a hurry; that the door was part way open, and that he pushed it open more in order to enter; that he was not looking or thinking about

what he was doing and could not understand why he did it. All of such statements were denied by the plaintiff, and in rebuttal plaintiff called a witness, Horner, to testify about a conversation between plaintiff and one of defendant's witnesses in plaintiff's room shortly after the accident. Defendant's witness had given his version of the conversation and of admissions made by plaintiff. When asked to state the conversation, Horner testified: "When I first came in I didn't know who was the man that I saw. I said: 'What in the world, Mr. Gray?' He says, 'I came hurrying into the building and went over to the elevator there and,' he said, 'it was open and,' he said, 'I just deliberately walked in.'" There was a controversy between plaintiff and defendant's witness as to how far the door was open. The witness was contending that the door of the elevator was not open as far as plaintiff claimed, and plaintiff was protesting.

## Opinion.

We are of opinion that plaintiff was guilty of contributory negligence as a matter of law and that he was not entitled to a verdict. The testimony of plaintiff and his witnesses compels the conclusion stated. We have endeavored to state, and have stated, the facts most strongly in plaintiff's behalf, and viewing them in the most lenient and helpful way, there is nothing to relieve plaintiff from being a confessed contributor to his misfortune. With all possible palliation, the bold and hard facts showing a lack of common prudence on the part of plaintiff remain with dominant force. He said: "I didn't look before I stepped in there;" and according to the testimony of his witness Horner, shortly after the injury plaintiff declared: "I came hurrying into the building and went over to the elevator. It was open and I just deliberately walked in." There was no denial that this statement was made. Plaintiff admitted that he had stated before that there was sufficient light in the lobby to see where he was going. He knew the door was open about two feet, only half way, and that the full width of the entrance when the door was completely open was four feet.

If the elevator was away from the landing at some upper floor, and if the door on the lobby floor was open for a space of two feet, the fact of the absence of the elevator would have been known to any one of ordinary observation who would look at the door. It is evident that the exercise of ordinary care would have disclosed to plaintiff the absence of the elevator. His statement to the effect that he did not *notice* any difference in the presence or absence of the elevator is persuasive that he did not look; and if he did look and, as he says, failed to notice any difference, such testimony could not have any more weight than plaintiff's further statement of his con-

clusion that "if it was to do over again, a person would do the same thing. I don't see nothing preventing any person doing the same thing I done before." This testimony is relied upon by counsel for plaintiff as having evidentiary value. We think it has none. Counsel for plaintiff also say there is nothing to contradict plaintiff's testimony that with the car away and the door open it appeared the same as it did when the car was there. Under the circumstances and admitted facts such evidence is without value and is not evidence at all. Testimony contrary to known physical facts cannot be regarded otherwise than impotent to establish any fact other than its own utter futility. The admitted physical facts in the instant case are diametrically opposed to the contention that appearances were the same whether the elevator car was present at the lobby floor or absent. Testimony that while one approached an open elevator door the appearances, which would include the vacant elevator shaft with no light in it, would be the same as the appearances presented when the lighted elevator was at the floor level, cannot be accorded probative value. The car had a light and there is no proof that it was ever unlighted. Plaintiff said, however, that the light was dim, and that he had gone in and out of the elevator repeatedly every day for two weeks. Testimony that the presence or absence of the car made no difference in appearances in the approach to an open door and the elevator shaft is equivalent to saying that the elevator cab lacked physical properties; that it would make no impression on the sense of perception; that it was invisible, and that the effect of its presence upon appearances was *nil*. Common sense and a common understanding of things physical characterize the *genus homo* and run contra. Further, the acceptance of such testimony would be equivalent to allowing the witness to invade the jury box and decide for the jury the questions of fact involved. Whether appearances were in fact the same, and whether a person of ordinary prudence would "do the same thing" that plaintiff did, should be resolved by the jury under competent evidence and should not be determined by the conclusions and declarations of any witness. [Dyrcz v. Hammond Packing Co., 194 S. W. 761, 764.]

It is evident that the use of ordinary care would have disclosed the absence of the elevator at the time plaintiff stepped through the door. It is impossible to believe that the use of any degree of care at all could have accompanied plaintiff to his fate, and it is plain that ordinary care on his part would have caused him to look before stepping into the elevator shaft and would have prevented him from entering the door. Ordinary prudence did not attend him when he "deliberately walked in." That he did deliberately walk in without looking and thereby failed to see that which was plainly visible is clearly demonstrated.

The evidence was insufficient for the jury to find that the operator of the elevator stood adjacent to the elevator shaft *in an inviting manner for plaintiff to take passage upon the elevator;* there was no pleading or evidence of any custom which would justify the plaintiff in stepping into the elevator shaft without the use of ordinary care; and likewise no evidence that in entering the elevator shaft plaintiff relied upon any custom, and the trial court so instructed the jury.

Plaintiff contends that "there is not a shred of evidence to indicate that plaintiff was not looking where he was going," and that plaintiff's testimony that he did not look referred to the fact that he had not "particularly looked for the car." To this we cannot agree because it is patent that the contrary is true. Nor do we agree with plaintiff's counsel that the circumstances invited plaintiff to walk into the elevator shaft. We think the court correctly instructed the jury that there was no evidence that an operator of the elevator stood at the elevator shaft in an inviting manner for plaintiff to take passage upon the elevator and plaintiff's testimony shows as much. He stated that there were a number of bell boys in uniform; that they all looked alike; that one of them was near the elevator door looking out the lobby window, and "he seemed to be looking toward the street south. I don't think he ever saw me. He was standing there looking out south, like you was standing there and the elevator was here and he was facing out, looking at the window. I think he was looking at me." "Q. He wasn't looking at the elevator as far as you could tell? A. I don't suppose he was." "Q. Do you think he was looking out the window? A. I think he was looking out the window." He also testified the boy was leaning against a desk or chair behind the desk, and that in his opinion this particular boy was standing within two feet of the north wall. The north wall was shown to be fifteen feet from the elevator. The presence of a bell boy in the attitude and under the circumstances described by plaintiff could in no way constitute a "silent invitation" to enter the elevator shaft. There was no implied representation that the elevator car was ready to transport him. Neither did the partially open door constitute an invitation to walk through it into space. It could more reasonably be designated a warning of possible danger. In any event it was not an assurance of safety. Particularly applicable is the expression in the opinion in Bremer v. Pleiss, 121 Wis. 61, 65, 98 N. W. 945:

"It seems to us entirely clear that the fact that the door is only part way open is a definite and unequivocal advertisement that something is wrong—certainly not an assurance that the car is there. The use of passenger elevators is now so universal that all know that when an elevator car is brought to a standstill, ready for passengers

to enter or leave, the door is always thrown wide open. A door only half way open is a plain suggestion of some unusual condition—a hint to investigate, not an invitation to enter or an assurance of safety.''

The above case was cited and relied upon by this court in the decision of Cox v. Bondurant, 220 Mo. App. 1. c. 954, and the opinion of Judge TRIMBLE was approved and adopted by the Supreme Court in State ex rel. Cox v. Trimble, 312 Mo. 322. The principles underlying the decision in the Cox case are applicable to the case at bar and we think decisive of the law question that plaintiff was guilty of contributory negligence. The evidence most favorable to plaintiff is that the door was not more than half way open, and the greater weight of evidence shows that plaintiff pushed it open. However, viewing the evidence and accepting the facts as plaintiff says they were, he is still confronted by the rule that a partially open door is a warning and not an invitation. [See also Marshall v. United Rys. Co. of St. Louis, 209 S. W. 931.]

Plaintiff relies upon Grote v. Hussmann, 204 Mo. App. 466, 223 S. W. 129; Aiken v. Sidney Steel Co., 197 Mo. App. 673, 198 S. W. 1139; Katz v. Development Co., 14 S. W. (2d) 701; Kennedy v. Phillips, 319 Mo. 573, 5 S. W. (2d) 33; Crawford v. Stockyards Co., 215 Mo. 394, 114 S. W. 1057; and State ex rel. Cox v. Trimble, 312 Mo. 322, 279 S. W. 60.] None of these was decided upon a state of facts similar to that in the instant case. The nearest approach is the case last cited and it clearly supports the contention of defendant that plaintiff was guilty of contributory negligence as a matter of law.

It is unnecessary to consider the instruction. The judgment against Bertha M. Levy should be reversed. The Commissioner so recommends. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of BOYER, C., is adopted as the opinion of the court. The judgment against Bertha M. Levy is reversed. *Trimble, P. J.,* and *Arnold, J.,* concur; *Bland, J.,* concurs in result.