ROBERT O'DELL, Appellant, v. FRANK DEAN.—No. 40040.—204 S. W. (2d) 248.

Division One, July 14, 1947.

Rehearing Denied, September 8, 1947.

*Stanley Garrity, William H. Sanders* and *Caldwell, Downing, Noble & Garrity* for appellant.

*Clay C. Rogers, Joseph J. Kelly, Jr.,* and *Mosman, Rogers, Bell & Field* for respondent.

■■■ DALTON, C.—Action for $15,000 damages for personal injuries alleged to have been occasioned by defendant's negligence. Verdict and judgment were for the defendant and plaintiff appealed.

Plaintiff was an employee of a tenant in the Keystone Building, 1320-22 Main Street, Kansas City. He was injured when he stepped into an open passenger elevator shaft at the lobby floor level and fell to the bottom of the shaft. The cause was submitted on alleged negligence in failing to keep the first floor lobby and elevator shaft reasonably lighted, in failing to provide any guards, locks, railings or other device in and about the elevator shaft and door, and in failing to warn plaintiff of the danger.

Error is assigned on the admission of evidence and the giving of instructions offered by defendant, but defendant, as respondent, contends the errors, if any, are wholly immaterial because plaintiff was guilty of contributory negligence as a matter of law. If no case was made for a jury, the errors complained of are immaterial. Bootee v. v. Kansas City Public Service Co., 353 Mo. 716, 183 S. W. (2d) 892. We shall state the evidence favorable to plaintiff and disregard defendant's evidence unless it aids the plaintiff's case.

Defendant owned and operated the Keystone Building as an office and business building, and rented parts of the building to different tenants. The Midland Radio and Television Schools, Inc., occupied the sixth floor and some other parts of the building. Defendant retained possession and control of a first floor common lobby, which was used by various tenants and their employees as a means of ingress and egress into the building. Defendant further exercised control of the elevator, paid the wages of the elevator operator and furnished each tenant a key to the building. The superintendent of the Midland Radio and Television School, by whom plaintiff was employed, furnished plaintiff a duplicate key. Defendant made no objection to tenants furnishing employees with duplicate keys. The elevator was regularly operated by defendant's employees from 7 A. M. to 6 P. M., but the elevator operator and janitor left the building at 6 P. M. and locked the outside door to the lobby. The elevator cage was left at street level, the lights in cage were turned off and the door into the shaft was closed. It was quite customary for instructors, who carried keys to the building, to go into the building on Saturdays and Sundays, or in the evening, and to operate the elevator. Defendant knew of and acquiesced in such practice. Plaintiff also knew that other instructors, army personnel and anyone, who had a key to the building, used the elevator at will. The elevator shaft was enclosed by a solid wall. A solid metal door covered the opening from the shaft into the lobby. The door was operated by a lever from inside the shaft and it could be locked by a movement of the lever. There was a small hole in the metal door, through which a small metal bar could be inserted and the lock or catch released, so that the door could

be opened from the outside. Plaintiff had seen others use the bar to open the elevator door and he had used it himself on occasions. The door had to be manually opened or closed. When opened, the door moved to the right. There was no handle or knob on the outside of the door. The elevator cage could be operated when the lobby door was open and the door could be opened whether or not the elevator cage was at the floor level. The small metal bar was usually kept on the edge of the moulding, 5 feet from the floor, and near the elevator door. Plaintiff had operated the elevator on several occasions and knew that "the door apparently was worn . . . if you slammed the elevator door too hard it would bounce back open, . . . probably half way or sometimes three fourths of the way open." The lobby was provided with two ceiling lights, one of which was usually left burning, but they could be turned off or on by switches near the foot of the steps, some 5 feet back from the elevator door. A small light located within the elevator cage could be turned on or off from within the cage. Plaintiff knew where the switch was located and had turned it on and off. There was never any light in the elevator shaft. ▆▆▆▆ The elevator cage could be operated up or down by a lever handle within the cage.

The building faced east on the west side of Main Street and the lobby extended west for some 15 feet from the lobby entrance to the foot of the steps, beyond the elevator shaft. The elevator door faced north, and between the elevator shaft and the front door, on the south side of the lobby, was a cigar, soda and candy stand. A solid wall extended along the north side of the lobby, except for a glass door, opposite the elevator door and a little east. This door opened into a first floor store room on the north side of the building. There was no evidence that any light could or did come through this door. The lobby space used by persons going into or out of the building was about 6 feet wide, north and south.

On the night of April 10, 1942, plaintiff, an instructor in the Midland Radio and Television School, had attended a school dinner for the graduating students and their associate instructors at the President Hotel. Some 150 to 200 soldiers, who were taking training, and some army personnel attended. Plaintiff drank no intoxicating liquor during the evening. He left the hotel about 10:00 P. M. and went to to his residence at 1601 Broadway, some 6 or 7 blocks away, to check some papers, but found he did not have "a master copy of a code test" and went back to the school to get it. On the way, he stopped at a cafe for some coffee and a sandwich and met a Mr. and Mrs. Scott. Mr. Scott was an instructor in the school and lived near plaintiff. The three left the cafe together about 11:30 P. M., intending to go by the school and then home. When they reached the Keystone Building, the outside door was locked and both lobby lights were off. On all other occasions when plaintiff had visited the building at night, the

lights had been burning. He had had no occasion to use the lobby light switches and did not know where they were located. He took his key, opened the front door to the lobby and the three entered.

On direct examination, plaintiff described the lighting conditions and what happened as follows: "For some reason or other there was no lobby lights on that night. . . . Well, there was no light in the lobby and the only light was possibly from an arc light which is about 15 feet north of the building on that side of the street, and it was just, oh, an outline, possibly just enough of an outline so I could see going into the building. . . . Q. And that street light is where, did you say, with reference to the building? A. I believe it is about 15 feet north of the entrance. Q. In any event, was there some light shining into the front of that hallway? A. Yes, there was light in the front part of the hallway, enough so you could, oh, make out an object. I could tell on the front end—I could see where the cigar stand counter was. . . . The light back by the shaft, there was just enough light back there so I could see the outline of the elevator door, possibly— . . . Well, the door was partially open, like somebody had used the elevator. . . . It was partially opened. . . . I would say, oh, 18 or 20 inches, approximately 18 or 20 inches. . . . I had walked back to the door and saw that it was partially opened and looked down and hesitated for a second, to my knowledge thought the elevator was there— . . . to my satisfaction the elevator was there and I stepped in and wound up in the basement. Q. You found that you were mistaken? A. That is right. . . ."

When plaintiff walked up to the elevator door on the night in question, there was no light burning in the elevator shaft and there were no guard rails, chains or other guards about it. Plaintiff testified: "Q. Were you given any warning of any kind that the door was open? A. No, just that I could see the outline. . . . Q. And before stepping into it, had you looked into the open doorway? A. Yes, I had looked in, stopped and looked, hesitated a moment and looked in and stepped in."

On cross-examination plaintiff testified as follows: "Q. And when you got back toward the elevator it was so dark you couldn't see a thing? A. No, I could see sufficiently well that I could see an outline of the door itself, I could see the steps there. Q. Well, you looked in the elevator shaft, you couldn't see a thing, could you? A. Possibly in the shaft itself, no. Q. It was just pitch dark? A. Well, I presume there would be a little light, very little. Q. Well, such that you couldn't see a thing? A. That is right. Q. Now, you say that you had been there at nights and other times like on Sunday, and that you had found the elevator door open on the first floor? A. Yes, the door had been left open on different occasions. Q. And you had seen that? A. Yes. Q. And at any time you had ever seen the door open with the elevator on, the elevator light was on, wasn't it?

A. During the day, no. . . . A. Well, you say during the day. During the evening then? A. I believe the light had been out on one or two different occasions when the door was open. . . . Q. So that any time you ever saw the elevator door open, the elevator light was on right there, you saw it, is that true? A. To my recollection, yes.'' Re-direct examination: ''Q. And did you ever go to that door and find it open and the elevator not there before the night that you fell? A. No. If the door was open the elevator was always there. . . . Q. All right. Now, in the elevator itself, and I am talking about the elevator cage now, what is the color of the floor of the cage of the elevator, or was it at the time of this occurrence? A. At that time there was a dark rubber mat, corrugated mat . . . on the floor. Q. . . . floor of the elevator cage? A. That is right.'' Re-cross examination: ''Q. Well, now do you say that the door was open 18 inches and you squeezed through without moving the door at all? A. As I recall, the door was open sufficient that I could step in and possibly. . . . Q. Well, you said about 18 inches, didn't you? A. It would be 18 or 20 inches. Q. Well, you say into a place which you say was so dark that you couldn't see a thing, you say you moved through that space of 18 or 20 inches without touching the door or moving the door or opening the door? A. I possibly walked in in a haze and touched the door as I went in, yes.'' The door on the elevator shaft was approximately 3 feet in width.

Was plaintiff guilty of contributory negligence as a matter of law? Appellant contends that ''the only negligence which can constitute contributory negligence as a matter of law under circumstances such as appear in this case, is where plaintiff steps through the elevator door and into the elevator shaft *without looking*.'' Appellant says ''that the door was not closed but open, and that before stepping into the shaft he first looked into the shaft, where he thought he saw the elevator.'' Appellant insists that ''before one can be guilty of contributory negligence as a matter of law in stepping into a shaft, it must be found that the plaintiff utterly and entirely failed to look before he stepped''; and that, in view of plaintiff's testimony ''that before he stepped into the shaft he first took a precautionary look into the shaft, where he thought he saw the elevator, contributory negligence became an issue for the jury.'' Appellant concedes that ''plaintiff would have had no case for the jury if he had not looked before stepping through the elevator door.'' Appellant argues that ''the difference between making or not making a case for the jury depends upon whether or not plaintiff looked, because that would be necessary in the exercise of due care.'' In support of his position, appellant cites Auferheide v. Thal, 77 Ohio App. 96, 63 N. E. (2d) 329; Bender v. White, 199 Wash. 510, 92 P. (2d) 268; Cox v. Bondurant, 220 Mo. App. 948, 7 S. W. (2d) 403, on certiorari writ quashed, State ex rel. Cox v. Trimble, 312 Mo. 322, 279 S. W. 60; Senseney v.

Landay Real Estate Co., 345 Mo. 128, 131 S. W. (2d) 595. Appellant seeks to distinguish the last two cases on their facts

▮▮▮▮ Appellant says the Missouri cases do not bar recovery "unless it be found that plaintiff failed to exercise due care by not taking even the slightest glance into the shaft before he stepped therein." The rule was applied in the Cox v. Bondurant case, supra, but in that case there was no lack of light. Plaintiff "simply failed to look." (7 S. W. (2d) 403, 406.)

Appellant quotes from 18 Am Jur., Elevators and Escalators, Sec. 51, p. 550, as follows: "A passenger cannot walk blindly through an elevator door; but if a hasty and cursory examination would lead an ordinarily prudent person to suppose that the elevator carriage is there, he is not necessarily negligent if he proceeds on that assumption." And from Sec. 80, p. 565, as follows: "Where an elevator approach is only dimly lighted, a person may be justified in thinking that an elevator is at the floor when in fact it is absent. Under such circumstances, his contributory negligence is plainly a jury question." We think the question here is whether there was any substantial evidence which would have led an ordinarily prudent person to suppose the elevator cage was present or any facts to justify such a person in thinking the cage was present when it was absent.

In the case of Bender v. White, supra, the hallway was dark (in violation of ordinance requirements) and plaintiff "in order to use the elevator, was required to make her way in darkness." She opened the elevator door, until it stopped, then put her foot into the shaft to feel for the elevator cage and was "steadying" herself with the partly opened door, when the door slipped and she fell 14 feet. Whether plaintiff used reasonable care, under the circumstances, was held for the jury.

In Auferheide v. Thal, supra, "gates, which were intended automatically to close the elevator shaft when the elevator was removed therefrom" had failed to function. The entrance to the elevator "was not completely dark." "When the plaintiff opened the door there was enough light for him to see the elevator shaft and the gates, had they been in place, and through the shaft, onto the other side of the pit. He testifies he saw the landing platform and also what, in the dim light, he thought were the gates in front of the elevator. What he actually observed was an object, an elevator gate, which had been placed there but a short time before, on the opposite side of the opening to the shaft which would have been mistaken for the gates at the entrance to the elevator on the side from which the plaintiff would enter." (63 N. E. (2d) 329, 331-332). The court recognized that the facts presented "a border line case" on contributory negligence, but approved its submission to a jury.

The facts here do not bring appellant's case within the situation stated in the case of Auferheide v. Thal, supra, nor within the situa-

tion stated in Aiken v. Sidney Steel Scraper Co., 197 Mo. App. 673, 198 S. W. 1139, 1140, where the court said: "It was not the light of broad day so that one could be charged with listlessly and blindly blundering into an elevator shaft; nor was it so dark that one could know, or realize, that he could not see. But it was in that indefinable state between full light and complete darkness which permits one to see imperfectly, and frequently deceptively, as in twilight."

Concerning the case of Senseney v. Landay Real Estate Company, supra, appellant says that the plaintiff in that case "opened the door and stepped in without a further glance." We do not so read the opinion which quotes plaintiff's testimony as follows: "I had it open and looked in and thought I saw the elevator and stepped in to turn on the light in the elevator. . . . I kept on going." (131 S. W. (2d) 595, 597.) Of the cases cited, only the case of Senseney v. Landay Real Estate Company, supra, was decided on essentially similar facts and we consider it to be controlling here.

Considering the record before us, plaintiff knew of the presence of the elevator shaft and knew that the door was partially open and unguarded. He knew that the elevator was used by others. He didn't have to use the bar that night, because the door was already partially open. He never at any time said there was sufficient light in the shaft for him to see anything. He did not say that he saw anything in the shaft, or saw anything he thought was the elevator, or the elevator floor. It should be noted that the elevator door did not face the street, but faced north on the side of the lobby. When plaintiff entered the lobby, he could see "possibly just enough of an outline so that he could see going into the building." The street light was not in front of the entrance to the building, but some 15 feet north of the entrance. The light shining into the front part of the hallway was just enough that he could "make out an object." He could see "where the cigar stand counter was," he "could see the outline of the elevator door" and he could see the foot of the steps, which faced the front of the building. He admitted that there was so little light in the shaft he could not see a thing. He looked down and hesitated for a second, "thought" the elevator was there, to his "satisfaction" the elevator was there, and he stepped in. Later, he said, he looked in before he stepped in.

There is no testimony in this record to support appellant's contentions that he "saw what appeared to be the elevator," or "saw what appeared to be the floor of the elevator cage," nor is there any evidence that "he could see into the shaft." On the other hand, he testified that it was so dark in the elevator shaft he couldn't see a thing. Plaintiff did testify that he had never before found the elevator door open when the elevator was not there. "If the door was open, the elevator was always there." He did not assign this as a reason for being satisfied or thinking that the elevator was there on this occa-

. sion. He had found the door open and the cage light out on only "one or two different occasions." He had opened the elevator door with the metal bar only "once or twice," and had "used" the elevator himself "several times before." No custom or practice justifying reliance on the presence of the elevator was shown. See, Sodomka v. Cudahy Packing Co., 101 Neb. 448, 163 N. W. 809; Gray v. Levy, 226 Mo. App. 991, 48 S. W. (2d) 20, 24.

"Where the entrance is dark, it would seem that ordinary care would condemn the act of a person, who knew the location of the elevator shaft and that others might likely be using the elevator, in stepping into the elevator shaft without satisfying himself that the elevator is in fact there." Macon Savings Bank v. Geoghegan, 48 Ga. App. 1, 171 S. E. 853, 855; 18 Am. Jur., Elevators and Escalators, Sec. 51, p. 549.

In Central Publishing House v. Flury, (Ohio Apps.), 157 N. E. 794, 798, in considering a case, where plaintiff stepped into an elevator shaft when it was so dark "he could not see one foot in front of him," the court said: "Darkness is nature's own warning to arouse the natural instinct of self-protection, the first law of nature. Indifference to such an instinct is a clear violation of a fundamental physical law, and should be, under circumstances like those of the instant case, more impressive and convincing than a sign 'Danger,' nailed on the door. Darkness was a danger in the instant case that stood gaunt and menacing in front of the eyes of the plaintiff, and under such circumstances as appear in this record to enter the shaft is, in our judgment, such contributory negligence as should prevent a recovery in law."

We agree with appellant's statement that "plaintiff's testimony is to be considered in its entirety," but the record speaks for itself. If, as appellant concedes, plaintiff was required to look before he stepped, in order to avoid contributory negligence as a matter of law, then he must look when he could see, or otherwise ascertain that the elevator cage was present. The partly open door was not an invitation to enter the dark shaft without ascertaining that the elevator cage was present. Gray v. Levy, supra, 48 S. W. (2d) 20, 24; Bremer v. Pleiss, 121 Wis. 61, 65, 98 N. W. 945, 946. Plaintiff knew the door was worn and, if slammed, it might bounce back and remain partly open. Standing before the known open door of a known elevator shaft and looking into the dark shaft, where he could not see anything, and where he did not see anything and then stepping into the shaft without knowing that the elevator was there does not evidence due care for his own safety. The record discloses no facts excusing plaintiff from stepping into the dark elevator shaft without exercising ordinary care to determine that it was safe to do so. There was no issue for the jury. Plaintiff's own testimony shows that he was guilty of negligence as a matter of law directly contributing to his injuries.

870

Senseney v. Landay Real Estate Co., supra; Bonanomi v. Purcell, 287 Mo. 436, 230 S. W. 120; Marshall v. United Rys. Co. of St. Louis (Mo. Sup.), 209 S. W. 931, approving dissenting opinion in Marshall v. United Rys. Co. of St. Louis (Mo. App.), 184 S. W. 159, 165; Rice v. Goodspeed Real Estate Co., 254 Mich. 49, 235 N. W. 814.

The judgment is affirmed. *Bradley* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.