LEO PHEGLEY, Respondent, v. ROBERT GRAHAM, Appellant, HAUGHTON ELEVATOR COMPANY, a Corporation, Respondent.—No. 40901.— 215 S. W. (2d) 499.

Division Two, December 13, 1948.

*Moser, Marsalek, Carpenter, Cleary & Carter* and *Lee M. Carter* for (defendant) appellant Robert Graham.

*Evans & Dixon, William W. Evans* and *John F. Evans* for Haughton Elevator Company.

*Kramer & Chused* and *Everett Hullverson* for (plaintiff) respondent; *Forrest Boecker* of counsel.

[500] BOHLING, C.—Leo Phegley recovered a judgment of $25,000 against Robert Graham, the owner of the Park Manor hotel, St. Louis, Missouri, for injuries sustained when he lost his balance and fell down the passenger elevator shaft at said hotel. The Haughton Elevator Company, a corporation, was also a party defendant but was exonerated by the jury. Defendant Graham appealed. He makes no contention respecting his submitted actionable negligence in permitting the interlocking device on the hoistway door of the elevator shaft to become so worn as to permit of its opening while the car was not at the floor level. He contends plaintiff was guilty of contributory negligence as a matter of law; that he was prejudiced with regard to his liability to plaintiff by his codefendant's instructions, and that the verdict was excessive. The first and last contentions call for the most favorable view of the evidence permissible to plaintiff.

The Park Manor hotel has 200 rooms and furnishes accommodations to people who stay overnight but mostly to persons who are permanent residents. It has a lobby on the ground floor. Four steps lead from this lobby to a balcony, or aisle, and the passenger elevator shaft is about 15 to 20 feet from the landing of the steps on the aisle.

The passenger elevator is of the self-operating or automatic type and no operator is furnished by the hotel. The outer door to the elevator shaft on the lobby floor, one of the doors involved, was of glass, but it was dark, perhaps painted, and one could not see through it. It had a handhold at its left side as one faced it to pull it back. It was supposed to have an interlocking device which would prevent it from being opened if the elevator car was not at that floor level. It would not operate while the car was in motion. Also, there were

signal lights (evidently connected with and near the push button signals) which showed whether the car was in motion, a red light indicating that the car was moving.

The elevator car is equipped with a dome light. It has a mesh or lattice work door, [501] called the inner door, which one has to open to enter the car after opening the outer door. The handle on the inner door is also on the left side as one faces the elevator. The space between the outer door, the door on the elevator shaft, and the inner door, the door on the car, is two or three inches. The outer door is heavier than the inner door.

Plaintiff went to live at the Park Manor in June or July, 1945. He was five feet ten inches tall and so far as disclosed of record weighed 120 pounds eighteen months after the accident. His apartment was on the 10th floor, and he had occasion to use the elevator twice or oftener daily. He returned from work on July 9, 1946, about 5:30 or 5:45 p. m., having had a bottle of beer on the way home. He immediately went to his apartment, using the elevator, where he cleaned up and put on some lighter clothes. The elevator dome light was on. A light rain was falling when he returned to the lobby, so he sat there, read for thirty or forty minutes, and then decided to get his raincoat and go out to eat. He walked up the four steps to the aisle leading to the elevator, saw a man come off of the elevator at that time, and continued back to the elevator. Plaintiff's testimony in chief respecting the accident proper was brief; viz.: that the outer door could not be opened when the elevator car was not at that particular floor level; that the door was prevented from opening by an electrical lock or catch, and that he opened the outer door. "Q. Now, did you attempt to step in the elevator at the time you fell? A. No, I reached in there with the same movement and lost my balance," and he fell. The janitor and another person released plaintiff from the elevator shaft.

Defendant Graham argues "plaintiff knew that the elevator car was illuminated and its presence instantly discernible," and that "it is impossible to understand how he could have reached or leaned or moved forward when it was instantly apparent that the car was not there as soon as he opened the door." He relies upon the following from plaintiff's testimony to sustain his contention: Plaintiff was standing in front of the elevator shaft when he pulled back the outer door with his left hand for fifteen to twenty inches. When he reached with his left hand to open the inner door (the mesh door of the car), he was holding the outer door back with his right hand and lost his balance and fell. The outer or shaft door was self-closing and after opening it plaintiff had to hold it with his right hand to keep it from closing.

"Q. Just a minute; the first thing you came up and slid this [outer door] back with your left hand? A. Yes, sir.

"Q. Before you released that with your left hand you had to hold it with your right hand? A. You put your hand on it.

"Q. But before releasing it you pull it back with your left hand, but you have to put your right hand on it to hold it back? A. Yes.

"Q. And you reach the second time for the gate latch? A. Yes.

"Q. At all times you say you were standing there motionless without stepping, with your right hand against the outer door? A. You naturally lean forward when you reach in there. . . .

"Q. So you were in a position with your hand, or shoulder or some part of your body in contact with the outer door, holding it open, while you were reaching for the catch there, that is absolutely right, isn't it? A. I was probably pushing it back with the palm of my hand.

"Q. Before you reached for the latch on the inner cage? A. Yes.

"Q. This outer door was opened in this position and you were holding it back with the palm of your hand, the instant that occurred you knew whether that interior was light or dark, didn't you? A. Probably a light in the shaft coming down there.

"Q. Was there any light in the shaft? A. I didn't see any; I just thought the elevator was there.

"Q. You didn't see any light when you opened the outer door; that is true, isn't it? A. Yes.

"Q. All right. Now you knew that the elevator was equipped with a dome light, [502] and while you was on the elevator that space was lighted, wasn't it? A. Yes, but I had already started to fall.

"Q. We are talking about the time you opened the outer door before you reached for the latch? A. I did that with the same movement.

"Q. When you say the same movement, you had to open the outer door with your left hand and catch it with your right hand and reach again for the latch? A. That is momentarily, yes."

Plaintiff also testified to the effect that "you just automatically reach in there [for the inner door], and you reach for the door like that, and as I did that I fell over," and that he did not lunge for the door.

Defendant Graham cites the cases of Senseney v. Landay Real Est. Co., 345 Mo. 128, 131 S. W. 2d 595, 598; Cox v. Bondurant (May 4, 1925), 220 Mo. App. 948, 7 S. W. 2d 403, certiorari writ quashed in State ex rel. Cox v. Trimble (January 6, 1926), 312 Mo. 322, 279 S. W. 60; and O'Dell v. Dean, 356 Mo. 861, 204 S. W. 2d 248, 253, 254. The following from the Senseney case is stressed: "The court said [Cox v. Bondurant, supra] : 'Our attention has not been called to a case where recovery was allowed one, even an invitee, who approached

an elevator's shaft *knowing it to be such,* and which was *closed* by means of guards or doors, and *where he opened those doors* and stepped into the shaft without taking even the slightest precaution to ascertain if the elevator was there.' (Our italics.)'' The Senseney case and also the O'Dell case involved elevator shaft doors which could be opened manually by a key whether or not the car was at that level. Senseney looked through an elevator door window, saw nothing except darkness and he opened the door with the key, looked in, thought he saw the car, stepped in to turn on the light and fell. O'Dell, on the other hand, found the elevator shaft door partly open when he arrived at the elevator shaft, but he knew that the door, if slammed too hard, would bounce back half way to three-fourths open. The shaft doors of the elevators involved in the Senseney and O'Dell cases could be opened when the car was not at the floor level.

The Cox case involved a freight elevator of the type operated by ropes and had a screen gate which could be opened at any time. Plaintiff, delivering milk, opened the screen door, picked up a milk can, started to swing the can and stepped in, but the elevator was not there. The court observed that Cox was without any assurance that the elevator was there.

In the instant case the elevator was an automatic or self-operated elevator. Its outer or shaft doors were supposed to be equipped with an interlocking device which would prevent its being opened if the car were not at that floor level. Plaintiff testified that on all other occasions when the outer door could be opened the car was at the floor level and that this was his first experience of opening the outer door when the car was not at that level. Plaintiff saw a man come down the aisle who had just stepped off the elevator. It appears that there was some light reflecting into the shaft. Plaintiff did not step into the shaft but lost his balance while reaching for the inner door which he had reason to believe was there. The cases relied upon by defendant Graham are distinguishable on their facts and defendant has failed to establish plaintiff's contributory negligence as a matter of law.

Defendant Graham complains of two instructions given at the request of defendant Haughton Elevator Company. A contract was in force at the time of plaintiff's injuries between Graham and Haughton whereby Haughton undertook to furnish certain inspection, parts, oil and grease service, as in said contract more particularly provided, on the elevator involved. Plaintiff originally sued Graham. Graham asked leave to file a third-party petition, attaching a copy thereof to said motion. Thereafter, without any action of record by the court, plaintiff filed an amended petition joining Graham and Haughton as defendants on the theory they were joint tort feasors, styling Haughton as "Third-party defendant." Graham did

not assert any claim for affirmative relief against [503] Haughton, offered no proof and requested no instructions thereon. The only issues tendered involved the joint or several liability of the two defendants as tort feasors to plaintiff, and plaintiff has not appealed from the judgment exonerating Haughton.

Graham's complaint is to the effect Haughton's instructions direct a verdict in favor of Haughton and fail to embrace all the grounds of liability on the part of Haughton submitted in instructions, identical in effect, of plaintiff and Graham and also that, therefore, a conflict resulted in the given instructions. This may have merit with regard to one instruction. He says he may complain since his instruction contained a clause to the effect that if Haughton's negligence there submitted be found the sole cause of plaintiff's injuries the verdict should be in favor of plaintiff and against Haughton alone, as the cases hold one defendant may complain of a codefendant's erroneous instruction which affects his liability to plaintiff, citing Barr v. Nafziger Baking Co., 328 Mo. 423, 41 S. W. 2d 559, 563, 564; Grimes v. Red Line Service, Inc., 337 Mo. 743, 85 S. W. 2d 767, 770, and State ex rel. Nevins v. Hughes, 347 Mo. 968, 149 S. W. 2d 836, 840. An appealing defendant's substantial rights were held prejudicially affected by dismissing plaintiff's action against his codefendant where the evidence sustained an instruction that the negligence of the dismissed defendant was the sole cause of plaintiff's injuries (the State ex rel. Nevins case), and also by a burden of proof instruction directing a verdict for a codefendant if his negligence "remains in doubt in your minds" (the Grimes case). Both defendants appealed in the Barr case and one appellant was awarded a new trial because an instruction of his codefendant assumed a controverted fact material to his defense.

However, an appealing defendant may not complain of all errors in a codefendant's instructions. Neal v. Curtis & Company Manufacturing Co., 328 Mo. 389, 41 S. W. 2d 543, 553[15], in ruling on the complaint of one defendant against instructions of its codefendant, held: "We cannot say that this instruction can or did prejudice this defendant in any way *other than to prevent a joint verdict and judgment against both,* and of that defendant cannot complain." (Italics ours.) See cases there cited. One of the two defendants appealed in Story v. People's Motorbus Co., 327 Mo. 719, 37 S. W. 2d 897, 901, and of said appellant's attack on its codefendant's instructions the court said: "And, even though the instructions were incorrect, its codefendant may not complain where the instructions do not affect such codefendant as to its defenses. The instructions merely advised the jury that plaintiff was not entitled to recover if they found certain facts to be true." See also Gabelman v. Bolt, 336 Mo. 539, 80 S. W. 2d 171, 174. This is recognized in the State ex rel.

Nevins (149 S. W. 2d l. c. 839) and Barr [citing authorities] cases, supra, observing: "This is on the theory that the plaintiff is the only one prejudiced by error which allows one of the defendants to escape its liability to plaintiff."

Where a guest at a hotel was injured by the fall of an elevator it was held in Stott v. Churchill, 36 N. Y. S. 476, 477, 15 Misc. 80 (affirmed in 157 N. Y. 692, 51 N. E. 1094): "Appellants owed it to respondent to exercise at least ordinary care and prudence in the care and management of the elevator and the inspection thereof. A personal duty cannot be delegated to another, so as to relieve the person bound to perform the duty from liability for its nonperformance." Approved in Sciolaro v. Asch, 198 N. Y. 77, 91 N. E. 263, 32 L. R. A. (N. S.) 945. So, too, in Missouri: Where one was injured by the falling of an elevator, Bartley v. Trorlicht, 49 Mo. App. 214, states: "A master is under an *absolute duty* to use reasonable care and inspection in regard to the machinery and appliances placed by him in the hands of his servants to use . . ." (l. c. 230.) And: "The absolute duty of exercising reasonable care, to the end that the machinery and appliances placed in the hands of his servants will not endanger their lives or members, rests upon him equally, whether he attempts to exercise that duty through an independent contractor, through another servant, or by himself in his proper person." (l. c. 231.) Consult McCloskey v. Salveter & Stewart [504] Inv. Co., 317 Mo. 1156, 298 S. W. 226, 234; Stanley v. Bircher, 78 Mo. 245, 248.[1]

The negligence submitted, if any, of Haughton was failure to exercise ordinary care (a) to discover the dangerous condition of the door, (b) to correct that condition in the course of its regular service, and (c) to report any unusual condition requiring special work to Graham. These duties rested primarily upon Graham as owner in possession and innkeeper, and he could not relieve himself of their performance by delegating them to another. The sole cause clause relied upon by Graham was not warranted in law and should have been refused. A defendant is not in a position to urge an alleged conflict if his own instruction be erroneous. Harbaugh v. Ford Roofing Co. (Mo.), 281 S. W. 686, 690. Furthermore, the jury found Graham negligent. Haughton's instructions may have been too favorable and prevented a joint verdict but Graham may not have a retrial of plaintiff's action merely for that reason. (Authorities supra.) The judgment was for the right party as between plaintiff and appel-

---

[1]See also: Rumetsch v. Wanamaker, 216 N. Y. 379, 110 N. E. 706[1, 4], L. R. A. 1916 C, 1245, 1248; Kopta v. Greer Shop Training, Inc., 327 Ill. App. 470, 64 N. E. 2d 570, 572[3]; 43 C. J. S. 1179, Sec. 22, n 60, 1181, nn 81-88; 32 C. J. 564, n 7; 52 C. J. S. 36, Sec. 417(3), nn 99, 15; 36 C. J. 215, Sec. 894, n 81; 18 Am. Jur. 528, Secs. 8, 9, 11; 28 Am. Jur. 579, Sec. 56, n. 9; Annotations: 29 A. L. R. 749, 812; 23 A. L. R. 1009, Sec. 11 a, b; 43 L. R. A. (N. S.) 657; 56 Am. St. Rep. 808.

lant and appellant's contention is not within the cases relied upon. State ex rel. McClure v. Dinwiddie, 358 Mo. 15, 213 S. W. 2d 127, 131, points out that § 20 of the civil code (Laws 1943, p. 362; Mo. R. S. A. § 847.20) does not change the substantive law respecting contribution between joint tort feasor judgment debtors (R. S. 1939, § 3658; Mo. R. S. A. § 3658). Graham presented no claim against Haughton.

■ Is the $25,000 judgment excessive? Plaintiff, when injured, was 51 or 52 years of age and in good health. He worked for the Eisenstadt Manufacturing Company, manufacturers and wholesalers of jewelry, for 27 or 28 years and was Credit Manager and Assistant Cashier at a salary of $7,200 a year. He was discharged the first of the month following his injuries. Plaintiff fell 6 to 10 feet, striking the elevator motor and railing and then the concrete floor of the shaft. He suffered, in addition to bruises, contusions and lacerations on the head, arms, body and legs, injuries which included a fractured ilium, which healed, and a separation of the sacroiliac joint which is permanent and will continue to cause some pain and disability. One of plaintiff's orthopedic surgeons testified he would pass plaintiff's sacroiliac joint as all right. His injuries left him in a nervous and run down condition. He was in the hospital a little over a month. His hospital and medical bills approximated $550.

The excessiveness of damages is a troublesome issue where there is reasonable ground for controversy. There is no precise guide. Each case rests upon its peculiar facts, with due consideration to a reasonable uniformity of approved awards for similar injuries and the economic conditions involved. Brunk v. Hamilton-Brown Shoe Co., 334 Mo. 517, 66 S. W. 2d 903, 911; Joice v. Missouri-K.-T. Rd. Co., 354 Mo. 439, 189 S. W. 2d 568, 577; O'Brien v. Vandalia Bus Lines, Inc., 351 Mo. 500, 173 S. W. 2d 76, 78. We have considered the cases stressed by Graham[2] and plaintiff.[3] Plaintiff may not successfully and does not contend his injuries justify the $25,000 judgment, the [505] amount he prayed for. His injuries are far from being as severe as the injuries in the cases he cites. He stresses his past and probable future loss of earnings. This involves a fact issue

[2]Morris v. Atlas Portland Cement Co., 323 Mo. 307, 19 S. W. 2d 865, 878; O'Brien v. Vandalia Bus Lines, Inc., supra; Reeves v. Thompson, 357 Mo. 847, 211 S. W. 2d 23, 30; Turner v. Central Hdwe. Co., 353 Mo. Mo. 1182, 186 S. W. 2d 603, 616; Willis v Atchison, T. & S. F. Ry. Co., 352 Mo. 490, 178 S. W. 2d 341, 347.

[3]Margulis v. National Enameling & Stamping Co., 324 Mo. 420, 23 S. W. 2d 1049, 1052; Potashnick v. Pearline (Mo.), 43 S. W. 2d 790, 793; Gieseking v. Litchfield & M. Ry. Co., 344 Mo. 672, 127 S. W. 2d 700, 708; Easterly v. American Inst. of Steel Constr., 349 Mo. 604, 162 S. W. 2d 825, 829; Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S. W. 2d 311, 324; Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S. W. 2d 119, 124.

on which he had the burden. Plaintiff testified his employer needed someone to fill the position and it looked as if he would be laid up for sometime. Asked if he could give a straight out answer to whether he had been discharged after his years of service because he had been unfortunate enough to have had an accident, plaintiff replied: ''No, I don't have any straight out answer to that;'' that he did not know why they let him go; ''there was probably some little change in the management and ownership.'' There is little of record regarding plaintiff's ability to secure employment. He made application for work at ''several places.'' He secured work as a salesman at $50 a week, $2,600 a year. The law places upon a plaintiff the duty to act as an ordinarily prudent man to minimize avoidable consequences. The record discloses that between his discharge from the hospital on account of his injuries and the date of the trial plaintiff was confined in hospitals on four different occasions; viz.: In the Barnes hospital for about five weeks beginning in February, 1947; then in the Mc-Millan hospital sometime in May or June; and again in September; and next in the Missouri Baptist hospital in November, 1947. Plaintiff attributed these subsequent hospitalizations largely to a run down and nervous condition brought on by the accident but stated his drinking habits ''maybe'' had something to do with them, ''but I don't know.'' The Barnes hospital diagnosis showed: ''Alcoholism, Mixed Psychoneurosis, Anxiety, Depression, Dermatophytosis, both feet, Cellulitis, both feet.'' The diagnosis for the Missouri Baptist hospital of November 6, 1947, read: ''Admission diagnosis: Alcoholism. Final diagnosis: Alcoholism.'' We find no references in these hospital records to the injuries sustained by plaintiff in his fall. There is no clear and positive evidence of record that after plaintiff was in a physical condition to work he was unable to secure employment because of his injuries or that he was and is obliged to follow the vocation of a clerk or is prevented from again engaging in office work of a nature to that performed at the time of his injuries or in some vocation more lucrative than that of a clerk. Morris v. Atlas Portland Cement Co., note 2 supra. We think the award excessive by not less than $5,000 and a judgment of $20,000 to be in line, all factors considered, with the allowable maximum under the rule of uniformity. Zichler v. St. Louis Pub. Serv. Co., 332 Mo. 902, 59 S. W. 2d 654, 660; Webb v. Missouri-K.-T. Rd. Co., 342 Mo. 394, 116 S. W. 2d 27, 30; Carpenter v. Wabash Ry. Co., 335 Mo. 130, 71 S. W. 2d 1071, 1076; and cases cited in note 2 supra.

The Haughton Elevator Company filed a motion to dismiss the appeal as to it. Let it be overruled without prejudice.

The judgment will stand affirmed for the sum of $20,000 as of the date of the verdict if plaintiff files a remittitur of $5,000 within ten

days of the filing of this opinion; otherwise the judgment will be reversed and the cause remanded. *Westhues* and *Barrett, CC.*, concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. *Ellison, J.*, and *Tipton, P. J.*, concur, *Leedy, J.*, absent.