ANGELINA REPUCCI & another *vs.* EXCHANGE REALTY
COMPANY
(and a companion case [1]).

Essex.    May 8, 1947. — July 14, 1947.

Present: FIELD, C.J., LUMMUS, RONAN, WILKINS, & SPALDING, JJ.

*Fire Escape. Building Laws. Real Property,* Fire escape. *Landlord and Tenant,* Landlord's liability to tenant or his family or his invitee, Fire escape.

A notice by a State building inspector to the owner of a building in which ten or more persons were employed in a factory, that "in order to comply with the provisions of" G. L. (Ter. Ed.) c. 143, certain changes would be necessary, was sufficient to apprise the owner that that chapter applied to the building; and, the building thus having been brought within the scope of the statute, it did not cease to be subject to it merely by reason of a sale to a new owner.

Upon a notice by an inspector under § 21 of G. L. (Ter. Ed. c. 143 as appearing in St. 1943, c. 546, § 2, to the owner of a building in which ten or more persons are employed in a factory, that §§ 15 to 60 inclusive of c. 143 apply to the building, and by the provisions of § 51 as amended by St. 1943, c. 544, § 3, a direct right is conferred upon the employees in the factory to have available for their use the prescribed egresses and other means of escape in the event of fire and to have those egresses and means of escape "in good repair and ready for use," and upon the owner, among others, is imposed a reciprocal duty to provide such egresses and means of escape.

The requirement of G. L. (Ter. Ed.) c. 143, § 21, as appearing in St. 1943, c. 546, § 2, that "egresses and means of escape" from fire in a building therein described "shall be kept . . . in good repair and ready for use," did not refer only to additional egresses ordered by an inspector under the statute, but to every fire escape provided for the building.

The mere facts, that part of a fire escape provided by the owner of a building was attached to an adjoining building not owned by him and that the fire escape was not the only means of escape, did not relieve him of the duty of keeping the part so attached with the rest of the fire escape, in good repair and ready for use under G. L. (Ter. Ed.) c. 143, § 21, as appearing in St. 1943, c. 546, § 2.

The right of employees of a tenant in a building described in G. L. (Ter. Ed.) c. 143, § 21, as appearing in St. 1943, c. 546, § 2, to have fire

---

[1] The companion case is by Irene Andrews and four others against the same defendant.

escapes provided for them kept in good repair and ready for use, was not derivative through their employer as a tenant so that it was restricted by the principles of law relating to landlord and tenant or modified by any implied limitation based upon the apparent condition of the fire escapes at the time of the letting to the employer.

A finding of a violation of the requirements of § 21 of G. L. (Ter. Ed.) c. 143, as appearing in St. 1943, c. 546, § 2, and of § 51 as amended by St. 1943, c. 544, § 3, that the owner of a building therein described shall keep "egresses and means of escape" from fire which he provides "in good repair and ready for use," was warranted by evidence that a cantilever section of a fire escape did not descend normally but stayed horizontal until six persons were upon it, when it went down with a crash, that there was oscillation of the cantilever which probably caused certain nuts to become engaged and prevented normal operation, that this could have been prevented by a locking device, and that without such device the construction was not proper.

Two ACTIONS OF TORT. Writs in the Superior Court dated March 12, 1945, and February 4, 1946, respectively.

The cases were tried together before *Cabot*, J.

*D. H. Fulton*, for the defendant.

*C. L. Arnold*, (*J. Golant* with him,) for the plaintiffs.

WILKINS, J. The defendant in these two actions of tort was the owner of a building at 113 Munroe Street, Lynn, part of the fourth floor of which was leased to one O'Callaghan, who ran a factory where were employed the female plaintiff in the first action and the five plaintiffs, all females, in the second action [1] (the six being hereinafter called the plaintiffs). On December 5, 1944, a fire occurred in the building, and the plaintiffs were hurt on the cantilever section of a fire escape. There were submitted to the jury as to each of the six plaintiffs a count at common law for negligence in maintenance of the fire escape and a count based upon a breach of duty to provide "proper egresses or other means of escape from fire" due to failure to keep the fire escape "in good repair and ready for use." G. L. (Ter. Ed.) c. 143, § 21, as appearing in St. 1943, c. 546, § 2; [2] § 51, [3] as amended by St. 1943, c. 544, § 3. There were also submitted to the jury in the first action one count at common law and one count under the statute on behalf of the

[1] See G. L. (Ter. Ed.) c. 231, § 4A, as inserted by St. 1943, c. 350, § 1.

[2] See now St. 1945, c. 536.

[3] See now St. 1945, c. 510.

male plaintiff (the father of the female plaintiff, who was a minor) for consequential damages. G. L. (Ter. Ed.) c. 231, § 6A, as inserted by St. 1939, c. 372, § 1. The jury found for the plaintiffs on all the counts submitted to them. The defendant's exceptions relate to the denial of its motions for a directed verdict in its favor on each count.

The following facts could have been found by the jury: On the day in question during the noon hour the plaintiffs were in a room of their employer on the fourth floor when a fire occurred in a freight elevator well at the rear of the building. They started to leave by the "front way" as usual, but were deterred by smoke. They then went out by a door to a fire escape, which descended on the wall of the building and connected by a balcony over a passageway with a fire escape on an adjacent building (known as the Hurley building and not owned by the defendant) which led by metal stairs straight down to a cantilever stairway connecting with the ground. The plaintiffs descended uneventfully by the fire escape to the second floor level. There one of the plaintiffs swung forward a horizontal bar which was across the steps. They all descended the metal steps, eleven in number, and twenty-two and one half inches wide, and walked forward out onto the cantilever, which remained horizontal. When the last plaintiff had gone four or five feet out on the cantilever, it "went down with a crash," and all were thrown to the ground. The cantilever was not on the defendant's building but on the Hurley building, both owners having reciprocal rights in the passageway.

The cantilever rotated on a pintle as a fulcrum on the principle of the see-saw. The pintle was an iron rod affixed at one end to the Hurley building and supported from above on the other end. On the descending side of the cantilever was a flight of thirteen steps, which was about twelve or thirteen feet long, and on the opposite side, which was shorter, was a counterweight sufficient to keep the descending side (when swinging free and not in use) in slightly above a horizontal position, where it was checked by a chain running from the counterweight to the upper part of the fire escape. In normal operation the distance which one

would have to go out on the cantilever before it started to descend would depend upon his weight. With the lightest of the plaintiffs it would start to descend before she reached the open end. The horizontal bar which one of the plaintiffs swung forward was a continuation of a rod which ran down vertically to the cantilever. On the lower end of the rod were two horizontal projections forming a fork which, when the horizontal bar was across the steps, engaged the cantilever just in front of the counterweight and prevented any movement up or down. When the horizontal bar was turned ninety degrees to the left, the fork was disengaged from the cantilever, and in normal operation permitted the gradual downward movement of the cantilever upon the application of weight.

On the date of the accident G. L. (Ter. Ed.) c. 143, § 21, as appearing in St. 1943, c. 546, § 2, provided: "Any . . . building in which ten or more persons are employed in a factory . . . the owner, lessee or mortgagee in possession whereof is notified in writing by an inspector that sections fifteen to sixty, inclusive, apply thereto, shall be provided with proper egresses or other means of escape from fire sufficient for the use of all persons . . . employed . . . therein; but no owner, lessee or mortgagee in possession of such building shall be deemed to have violated this provision unless he has been notified in writing by an inspector as to what additional egresses or means of escape from fire are necessary, and for thirty days has neglected or refused to provide the same. The egresses and means of escape shall be kept unobstructed, in good repair and ready for use . . . ." Section 51 of the same chapter, as amended by St. 1943, c. 544, § 3, provided: "The owner, lessee or occupant of a . . . factory, workshop or manufacturing establishment, or whoever owns any building or part thereof mentioned in and subject to . . . [section] twenty-one . . . or controls the use thereof, shall cause the provisions thereof to be observed, and such person shall be liable to any person injured for all damages caused by a violation of the provisions of said . . . [section]." By § 53 there was provided a criminal penalty.

It was admitted in the defendant's answers to interrogatories that the building was one in which ten or more persons were employed in a factory, workshop, mercantile or other establishment. There was evidence that on October 10, 1925, a previous owner of the building had been notified in writing by a State building inspector that "in order to comply with the provisions of c. 143 of the General Laws" certain changes would be necessary. We assume, in accordance with the defendant's contention, that the changes thus required did not relate to the fire escape in question. The notice, however, was sufficient to apprise the then owner that G. L. c. 143 applied to the building, which, once having been brought within the scope of the statute, did not cease to be subject to it merely by reason of a sale to a new owner.

The statute was designed for the protection of human life against fire. *Stevens, landowner*, 228 Mass. 368, 373, 374. It is to be broadly construed so as to achieve this supremely important purpose. *Aldworth* v. *F. W. Woolworth Co.* 295 Mass. 344, 348. An intent to pass an ineffective statute is not to be imputed to the Legislature. *MacInnis* v. *Morrissey*, 298 Mass. 505, 509.

The defendant argues that it is not clear what egresses came within the act, and that before a statute can be interpreted to cast upon an owner the duty of an insurer it should be sufficiently definite to establish that result. We are of the opinion, however, that, reasonably construed, once there had been the written notice to the previous owner, the statute conferred a direct right upon the plaintiffs, as employees in a factory in the building, to have available for their use the prescribed egresses and other means of escape in the event of fire, and that those egresses and means of escape must be "in good repair and ready for use." A reciprocal duty was imposed by the statute upon the owner, among others, to provide such egresses and means of escape. We are not concerned here with the second reference in the statute to the subject of notice, by an inspector, as that "provision" we construe as having to do with failure to provide additional egresses or means of escape from fire, which is not the cause of complaint here.

The defendant urges, however, that the cantilever was not any portion of a structure required to be built or maintained under the statute, and, in other words, that it was not one of the prescribed "egresses and means of escape." We cannot accept the contention that the requirement that the "egresses and means of escape shall be kept unobstructed, in good repair and ready for use" referred only to the additional egresses ordered by an inspector. Such an interpretation of the statute would establish one standard of workability and repair for fire escapes installed by order of an inspector and another standard, perhaps no standard at all, for those provided without such an order. Here the fire escape in fact had been provided, and irrespective of the existence of other egresses or means of escape there was a duty to be performed that every fire escape so provided should be true to its name and in good working order. It is of no consequence that the cantilever itself was not on a building owned by the defendant, or that the fire escape on which the plaintiffs met injury was not the only egress or means of escape. We think that it is no answer to the plaintiffs to say that their employer also might be held to have violated the statute. We are of the opinion that the plaintiffs' right was not derivative through their employer in the sense that they cannot recover unless the employer, if injured in the same manner, also could recover, and that their right was neither restricted by the principles of law relating to landlord and tenant nor modified to the point of uselessness by any implied limitation based upon the apparent condition of the fire escape at the time of the letting to their employer.

The question remains whether the statute was in fact violated. There was evidence from which the jury could find that the cantilever was not "in good repair" and "ready for use" within the intent of the statute. There was expert testimony from one Powers, a construction engineer, to the effect that if the plaintiffs walked down the fire escape to the horizontal bar, and one of them "turned the bar to the left," and all in single file went onto the horizontal cantilever, and, while they were in that position,

the free end of the cantilever crashed to the ground, the cantilever was in a defective condition. He testified in some detail as to what he thought the defect was. To understand this, further description must be made of the method of construction. In order to anchor the fixed flight to the pintle, the pintle passed through openings in four stirrups, or U-shaped pieces of metal, one stirrup being just inside and one just outside each of the two stringers or strips forming the frame of the stairway to which the treads were attached. Of each pair of stirrups, one was from the fixed flight down, and one was in the frame of the cantilever. In the horizontal position the two U-shaped pieces adjacent to each stringer were side by side. On each leg of the four U-shaped pieces, or stirrups, there were nutted bolts about five eighths of an inch square, going from the stirrup to the stringer. As thus far described, there was nothing improper in the construction or operation of the cantilever, which is a device in common use and proper for the purpose. "The whole thing is built loosely so that it will operate freely." But Powers further testified that, with any upward or downward movement, this particular cantilever could "move laterally in and out, to and from the building" and could "move inwards towards the building between one half and three eighths of an inch"; that there thus existed "a condition which would permit inward displacement, so the nuts on the inner end of one set of stirrups would become engaged with the head of the nuts on the opposing stirrups"; that it was possible for this particular cantilever "to arrive in a horizontal position finally displaced inward towards the building in such a manner that those two pieces will bind"; that the binding of the bolts could be prevented by providing a locking device gripped around the pintle hard against the inside stringer of the cantilever; that such a device would not be difficult to install and without it the construction was not proper; that there was such a device, which consisted of a "stop," or bolt, screwed into the pintle on the outside of the cantilever, so there was a play in only one direction; and that because of this bolt there could not be any lateral movement of the cantilever outward.

The defendant contends that because of the following answers of Powers to questions by the judge his testimony cannot be taken to mean that there was a defect in the fire escape. "The JUDGE. How far would this . . . [horizontal bar] at the top of the eleven fixed steps above the cantilever have to be pushed open before the two pins down near the cantilever itself would disengage from the cantilever? . . . The WITNESS. It would have to swing entirely out . . . ninety degrees. It would have to swing in a position parallel with and above the hand rail going down on that side. The JUDGE. Supposing it swung out, let us say, somewhere between eighty-five and ninety degrees, you then would have a situation where these pins below were resting on only a part of the stringer? The WITNESS. That I think is fair, yes. The JUDGE. And then would it be possible, as weight is applied on the cantilever, that that would have a tendency to jam it by, to suddenly jam it by those pins? The WITNESS. There is that possibility, also. . . . The JUDGE. Having in mind that possibility, what do you now say probably happened that caused this cantilever to go down suddenly? The WITNESS. With this being brought out, I think I will go back to an earlier answer of mine, in which I said I do not believe I can discuss the degrees of possibility. The JUDGE. In other words, you are now unable to say which you think was the probable cause? The WITNESS. On what I have been able to observe and what I have been able to discuss, yes." The witness, however, immediately thereafter testified that if one of the plaintiffs opened the bar ninety degrees, and it was not turned back again, he was of opinion that the engaging of the nuts was the cause; that in that case he thought it probable that the nuts became engaged prior to the time the first plaintiff stepped on the cantilever; and that in order to change that opinion he would want to hear evidence that the bar was not turned to the ninety degree angle. There was actually no evidence that anyone turned back the bar after the first plaintiff had swung it open, or that anyone except the plaintiffs was upon the fire escape while they were. It is true that there likewise was no precise evidence as to the num-

ber of degrees to which the first plaintiff swung open the bar. But we think that the jury could have found that she did so to such an extent that the fork became disengaged. The other five plaintiffs testified either that they observed no bar, or that there was no bar impeding their descent of the stairway, which was slightly less than two feet wide. The expert testified that if the fork had been to some extent locking the cantilever after the bar was pushed forward, and had then become disengaged by the weight of the plaintiffs on the cantilever, the fork would have "dropped" or bent. It could have been inferred that there had been no damage to the fork from the testimony of the superintendent of the building that he had inspected the fire escape a month before the fire and found it in good running order, and again after the fire and noticed nothing "different" except a broken hand rail on the cantilever.

Since the plaintiffs were entitled to go to the jury on the statutory counts, we forbear discussion as to whether there was also a case for the jury on the counts based upon negligence.

*Exceptions overruled.*