Joseph Littleton **DERBOVEN**, a minor by His Next Friend Ernest Derboven, et al., Appellants-Respondents,

v.

Elbert H. **STOCKTON** and Ruth M. Stockton, Respondents-Appellants,

and

**Ray Curtis, Respondent.**

Nos. 25406 and 25411.

Missouri Court of Appeals, Kansas City District.

Dec. 20, 1972.

Motion for Rehearing and/or Transfer Denied Jan. 22, 1973.

Application to Transfer Denied March 12, 1973.

William O'Donnell Lee and Hunter, Chamier & Lee, Moberly, David Collins, Hadley E. Grimm and Collins & Grimm, Macon, for appellants-respondents, Derboven.

Hulen, Hulen & Tatlow, Moberly, for respondents-appellants, Stockton.

Channing D. Blaeuer, John L. Port, Moberly, for respondent, Curtis.

DIXON, Judge.

This case, written on reassignment, involves an appeal from a judgment in a death action against the landlord defendant and a cross appeal by the plaintiff from a judgment in favor of the tenant defendant. The appeal involves complex issues both procedural and substantive which can best be presented against the detailed background both factual and procedural.

The trial of this wrongful death action in the court below resulted in a jury verdict of $15,000 in favor of plaintiffs against Elbert H. Stockton and Ruth M. Stockton, defendants and lessors of the Randolph Tavern where the thirty-three year old decedent, Ruby Elizabeth Derboven, perished in a fire which had its origin in an act of arson. The plaintiffs were the husband and two minor sons of the decedent. The jury returned a verdict in favor of the defendant, Ray Curtis, the lessee and proprietor of the tavern at the time of the decedent's death. This appeal has been taken by the defendants Stockton from the judgment against them. The plaintiffs appeal that part of the judgment favorable to the defendant Curtis.

The defendants Stockton had owned the Randolph Tavern for eleven years prior to leasing it to Ray Curtis on January 1, 1968. The lease divided the maintenance responsibilities—the lessor agreeing to care for the "exterior and primary structure" and the lessee agreeing to maintain the "interior" of the leased building.

The defendant Curtis opened the tavern for business on February 9, 1968, seven days before the decedent was killed; and both Curtis and the defendants Stockton testified that they were thoroughly familiar with the premises prior to that opening date. The Randolph Tavern sold beer but no prepared foods and had a capacity of about twenty-five people.

On February 16, 1968, while the decedent was seated near the rear of the tav-

ern, Bill Coleman entered carrying a bucket containing about four gallons of gasoline. He proceeded to hurl the gasoline against the east wall and upon a bowling machine located near the front of the barroom. Coleman then ignited the gasoline and fled through the front door. Three of the patrons also managed to escape through the front door, but the remaining twelve people in the tavern, including the decedent, were killed.

The barroom of the Randolph Tavern was, in relevant detail, rectangular in shape—about eighteen feet in width from east to west and about forty feet in length from the south or front exterior wall to the north or rear interior wall. There were two possible routes of exit from that room. The first, a doorway located in the center of the front wall, was the main entrance to the tavern which was used by all patrons and deliverymen. That door was hinged so that it would open inwardly and could not be made to swing outward. The second possible route of exit was from the northeast corner in the rear of the barroom area. There an opening with no door in the rear interior wall gave access to a small utility area containing a refrigerator and water heater. This utility area was about nine feet in width, east to west, and about four feet in depth, south to north. On the rear wall of the utility area was an interior door which, when opened, provided access to a hallway which was eighteen feet long and led to the rear of the building. An exterior door at the end of the hallway opened to the alley behind the building. The opening to the utility area, the interior door, and the exterior door provided a straight path of exit from the barroom into the alley without changing directions or turning corners. Both the interior door and the exterior door were hinged in such a fashion that it was necessary for one exiting to pull the doors open, and it was impossible to pass through either door by pushing it open. Eight of the twelve bodies found after the fire, including the body of the decedent, were in the utility area and six of those eight bodies were "piled" against the interior door.

Including the arsonist, there were sixteen persons in the tavern when the fire commenced. Four escaped through the front door. The last to escape from the front door was a 70-year-old man seated approximately eight feet from the front door. All the others, except the arsonist who was apparently first out, were closer to the door. The fire was near the center of the room, and the decedent was seated within a distance of six to eight feet from the north or rear wall. All of those who were killed moved toward the north wall from their positions prior to the fire and to the route of exit through the rear hall. Six bodies were piled against the interior door, including decedent. Two more were close to the six and within the areaway or cubbyhole. Four more were at varying distances from the rear door, but all were north of the center of the room where the fire damage was the greatest. The plaintiffs below alleged that the maintenance of the doors in this fashion was a breach of the duty imposed upon defendants by statute, ordinance, and the common law; and that as a result of this breach of duty, plaintiffs sustained damages.

Over the defendants' objection, Section 320.070 of the Revised Statutes of Missouri (all references are to RSMo 1969 unless otherwise noted) was read before the jury. That section provides:

"All the doors for ingress and egress to and from all public schoolhouses and all other public buildings, and also of all theaters, assembly rooms, halls, churches, factories with more than twenty employees, and of all other buildings or places of public resort whatever, where people are wont to assemble, excepting schoolhouses and churches of one room and on the ground floor, which shall hereafter be erected, together with all those heretofore erected and which are still in use as such public buildings and places of resort, shall be hung as to open

outwardly from the audience rooms, halls or workshops of such buildings or places; provided, that said doors may be hung on double-jointed hinges so as to open with equal ease outwardly and inwardly."

Furthermore, Sections 106.1, 108.0 and 108.36 of the "Abridged Building Code" adopted by reference as an ordinance of the City of Moberly were entered as plaintiffs' exhibits and read to the jury over defendants' objection. Those sections provide as follows:

"The legal use and occupancy of any building or structure existing on [date of adoption of this code], or for which it had been heretofore approved, may be continued without change when such use is not detrimental to the general safety and welfare of the public, provided the building is not enlarged in height or area and the exit facilities are adequate for a new building of the same use and occupancy load." Sec. 106.1 BOCA Abridged Building Code.

"Every building and structure and part thereof hereafter erected shall have adequate exitways providing safe and continuous means of egress to a street, or to an open space with direct access to a street as herein provided. The owner or lessee of every existing building and structure shall be responsible for the safety of all persons in or occupying such premises with respect to the maintenance and adequacy of means of egress therefrom." Sec. 108.0 BOCA Abridged Building Code.

". . . All exit doors shall be hung to swing in the direction of exit travel without obstructing the required width of exitway. All exit doors shall be fitted with hardware, locks, and fastenings which can be readily opened from the inner side without the use of keys except as herein provided for dwellings and for assembly and institutional buildings. Draw bolts, hooks and other similar devices shall be prohibited on all required exit doors . . ." Sec. 108.36 BOCA Abridged Building Code.

The ordinance sections above were not pleaded in the plaintiffs' original petition, but were pled in an amended petition filed on the first day of the trial just prior to swearing of the jury. The defendants introduced into the record the sections that had been the basis, in part, for the plaintiffs' claim of negligence in the original petition. Those sections differed from the sections cited in the amended petition in that they were non-self-executing. They provided as follows:

"606.1 *Owner Responsibility*.—The owner or lessee of every existing building and structure shall be responsible for the safety of all persons in or occupying such premises with respect to the adequacy of means of egress therefrom."

"606.21. *Inadequate Exits*.—In any existing building or structure, not now provided with exit facilities as herein prescribed for new buildings and in which the exits are deemed inadequate for safety by the building official, such additional provision shall be made for safe egress as he shall order."

Sections 606.1 and 606.21 had never been formally adopted by the City as ordinances.

The evidence indicated that the Building Inspector of the City of Moberly did inspect the Randolph Tavern just prior to its opening in February of 1968; but no certificate of occupancy and compliance was issued, although the business was permitted to open subsequent to the inspection. The Building Inspector testified that there was "no reason to issue a certificate when there has been no changes made in the building."

After the fire was ignited, those who survived managed to escape within a matter of seconds. There was evidence that very shortly after the initial flash there was an "explosion" which the defendants assert was the cause of death of the people remaining in the building. However, there

was also competent testimony that an explosion would not occur ordinarily after the original "flash", but that the intense heat of the fire could have caused the plate glass windows at the front of the building to shatter, making a very loud noise which might be interpreted as an explosion. Furthermore, there was uncontroverted evidence as noted above that several of the bodies, including that of the decedent, were found at the rear exit.

The cause was submitted by plaintiff on an instruction bottomed on violation of the statutes and ordinances. No common law negligence was submitted. Two identical verdict directing instructions were offered and given. One directed a verdict against defendants Stockton, and one performed the same office as to defendant Curtis. They read as follows:

"Your verdict must be for the plaintiffs and against defendants Elbert H. Stockton and Ruth M. Stockton [Defendant Curtis in Instruction #3] if you believe:·

First,

plaintiff Ernest Derboven is the surviving spouse and plaintiffs Joseph Littleton Derboven and Ernest Eugene Derboven, are the minor children of Ruby Elizabeth Derboven and she had no other minor children either natural or adopted, and

Second, either:

that the Randolph Tavern was a place of public resort where people assembled and the door at the rear of the main room was not so hung as to open outwardly from the main room, nor was it hung on double-jointed hinges so as to open both outwardly and inwardly, or

that the exit door at the rear of the main room of the Randolph Tavern was not hung to swing in the direction of exit travel, and

Third, as a direct result of such conduct, plaintiffs sustained damage."

■ Defendant Curtis was exonerated by the jury verdict, but defendants Stockton did not attack that verdict in the motion for new trial filed by them. Plaintiff filed a motion for new trial as to the verdict in favor of defendant Curtis but the sole ground asserted is that ". . . the verdict is against the weight of the evidence." The plaintiff has not even briefed that purported point. Under authority of Rule 84.04(d), V.A.M.R. and State ex rel. Beeler v. City of Raytown, 453 S.W.2d 672 (Mo.App.1970), the point, if any there be, is not preserved for review and the plaintiffs' appeal as to defendant Curtis is dismissed.

Thus, pending for determination is the appeal of defendants Stockton as to the verdict against them.

■ The defendants Stockton raise initially the point that no amendment to the pleadings should have been permitted. Parenthetically, the point is not proper under the rules since it does not state why the trial court erred in permitting the amendment in accordance with Rule 84.-04(d), supra. The argument of defendants Stockton is related to the point briefed and argued that they should have been granted a continuance, and it will be considered in that light.

The defendants Stockton's complaint with respect to the late amendment and refusal of the continuance is their insistence that the change in the section numbers of the ordinances pled constituted such a change in the nature of the defense available that they were unable to meet it within the requirements of the trial court's action. Before considering that contention, it is necessary to clarify the basic facts with respect to the ordinances referred to. The portion of the transcript in which the ordinances were introduced is obscure, a fact which was noted by the trial court, who

admonished counsel to clarify the record when they repeatedly referred to the basic documents without identification as to their exhibit numbers. Piecing together the testimony of the City Clerk and the Building Inspector, the facts appear to be as follows.

The City of Moberly by an ordinance enacted May 21, 1962, enacted by reference a document referred to in the ordinance as The Building Officials Conference of America, Inc., Abridged 1960 Building Code. This was offered in evidence and contained the sections upon which the plaintiffs relied in their amended petition. Another document was offered in evidence and received which is styled The Building Officials Conference of America, Inc., Basic Building Code which consists of some 450 pages of textual material as opposed to the some 150 pages contained in the Abridged Building Code. The Basic Building Code contains the provisions upon which plaintiffs relied in pleading initially, and this particular document was not referred to in the ordinance enacting the Abridged Building Code. The difficulty arises when the Abridged Building Code is examined and it becomes apparent that the Abridged Building Code refers in various provisions to the more complete statement contained in the Basic Building Code. The Building Inspector's testimony, taken as a whole, would indicate that the Basic Building Code was utilized as a guide to interpret and apply the provisions of the Abridged Building Code. No question has been raised by the defendants Stockton by motion before trial or in their after-trial motion respecting the validity of the ordinance adopting by reference the provisions of the Abridged Building Code; and on the record here, it must be taken as admitted that this ordinance validly enacted the provisions of the Abridged Building Code as a part of the ordinances of the City of Moberly. No portion of the sections relied upon by plaintiffs in this case requires any reference to the more complete Basic Building Code.

With this background, defendants Stockton's argument is that having investigated the matter, they were prepared to defend against the original petition on the grounds that the Basic Building Code had never been lawfully enacted by the City of Moberly as an ordinance and that an action for negligence based on a violation of that Code would not lie. They, likewise, argue they were prepared to show that no affirmative action by the Building Inspector requiring a change in exit facilities had been taken as required under the more comprehensive code. They claim that as a result of the court's permitting the amendment of the petition immediately prior to the swearing of the jury, they were deprived of these defenses and were unable to meet the issues raised by the amendment without a continuance.

The difficulty with the defendants' position on this regard is that although it is apparent that the defenses were no longer available as against the amended petition, they do not assert in their motion or their brief or argument any defense to the amended petition or suggest evidence which they were precluded from offering as a result of the trial court's requiring them to go to trial. Nor do they assert that time would have permitted discovery of any evidence relating to a defense under the amended pleading.

█ They cite and rely upon Simon v. S. S. Kresge Co., 103 S.W.2d 523 (Mo. App.1937), and Davis v. Kansas City Public Service Co., 233 S.W.2d 679 (Mo.Sup. 1950), l. c. 683. The Kresge case involves the question of an amendment to the pleadings raising a new issue to which the defendant had had no opportunity to either reply or prepare a defense and involves the basic question of the necessity for special pleading of certain elements of damages, to-wit: arthritis when nothing had been brought to the attention of the defendant to advise it that any such claim would be presented in the evidence. In the Davis case, the same issue was involved, that of the defendant's inability to meet a claim of

an aggravation of an arthritic condition; and in the circumstances of that case, the court held that the ruling was within the discretion of the trial court and would not be disturbed in refusing the defendant a continuance. The examination of these cases indicates that the amendments in those cases injected a *new* issue in the case in the sense that it was an issue entirely foreign to the claims originally made by the plaintiff in terms of the damage sustained and that the medical proof of the defendant would be *changed* by the amendment, or at the least would require additional medical proof. There is no claim here that the evidence of the defendants Stockton would be different as to the negligence pleaded. The issue raised by both the pleading of the unenacted Basic Building Code and the Abridged Building Code relates to the same facts. Both of the codes provide affirmatively that exit facilities should be safe and adequate and that is the basic issue with respect to the doors in question. As plaintiff indicates, the fact that a defense is rendered obsolete by an amendment is not a ground of prejudice and that the real test is whether additional proof or additional witnesses for which a party is not prepared would be required to meet the new allegations; Ethridge v. Perryman, 363 S.W.2d 696 (Mo.Sup.1963), 1. c. 703. The defendants Stockton make no claim that additional witnesses or proof were required to meet the issues of the amended petition and the action of the trial court in denying a continuance after permitting the amendment is sustained.

As will be noted, a great deal of the complexity of the issues in this case arises upon plaintiffs' insistence that defendants Stockton have not properly raised for our consideration many of the issues briefed. On the central and overriding issue of construing Section 320.070 that must be first resolved, the parties meet on a common battleground. Plaintiffs urge both that the Randolph Tavern was a "place of public resort where people are wont to assemble" and that the door to the hallway was a door for "ingress or egress." Defendants Stockton assert neither proposition is true and thus plaintiffs' case must fail.

Unlikely as it may seem, this statutory designation of the particular places included within the statute has never been construed by any court. The language appears in the same or similar form in the statutes of several states. The defendants Stockton have cited only an opinion of the Minnesota Attorney General construing the Minnesota statute as authority for the proposition that the Randolph Tavern was not within the meaning of Section 320.070. The more narrow language of the Minnesota statute deprives the opinion of whatever persuasive effect might otherwise be claimed for it.

The overriding and basic tenet of statutory interpretation, determination of legislative intent, must then control. Learned v. Godfrey, 461 S.W.2d 5 (Mo. Sup. En Banc 1970), 1. c. 7. Edwards v. St. Louis County, 429 S.W.2d 718 (Mo. Sup. En Banc 1968), 1. c. 722. State ex rel. Schwab v. Riley, 417 S.W.2d 1 (Mo. En Banc 1967), 1. c. 3–4. In aid of that determination, certain recognized rules of principles of construction may be utilized to determine legislative intent. Words will be given their normal and ordinary meaning unless a contrary meaning plainly appears. State ex rel. State Highway Commission v. Wiggins, 454 S.W.2d 899 (Mo. Sup. En Banc 1970), 1. c. 902. State of Missouri v. Brady, 472 S.W.2d 356 (Mo. Sup.1971), 1. c. 358. When the overall purpose of a statute is plain and it is remedial, then it will be construed broadly and liberally to effect its plain purpose. "Statutes enacted for the protection of life and property, or which introduce some new regulation conducive to the public good, are considered remedial in nature and are generally given a liberal construction." City of St. Louis v. Carpenter, 341 S.W.2d 786 (Mo.Sup.1961), 1. c. 788. Remedial legislation will be construed so as to suppress the mischief sought to be prevented.

B–W Acceptance Corporation v. Benack, 423 S.W.2d 215 (Mo.App.1967), 1. c. 218. State v. Miles Laboratories, 282 S.W.2d 564 (Mo.Sup. En Banc 1955), 1. c. 574. Judicial definitions of particular words or phrases in connection with other statutes will be at least persuasive on the meaning intended by the legislature as to the particular statute being considered.

■ When the language of the statute is considered in the light of the rules of statutory construction which are applicable here, it is plain that the statute applies to the premises in question. Looking first to the overall legislative intent and the enactment of the statute generally, the location of the statute in the chapter dealing with matters relating to public safety, and in particular with respect to fire, it can only be concluded that the measure was intended to protect the public from fire by permitting ready exit from buildings to which it applies.

■ Equally plain is the legislative intent to eliminate the danger to the public from exit doors which would not freely open upon the occasion of fire when large groups of people sought simultaneous exit. The plain language of the statute makes it apply to public school houses and all other public buildings. Conjunctively included are theaters, assembly rooms, halls, churches, and factories with more than twenty employees. From this, it can be concluded that the legislature was enumerating all of the places generally recognized as places of public assembly and with no more the Randolph Tavern would not be included under the terms and provisions of the statute, but the legislature included the broad language, "and *of all other buildings* or places of public resort *whatever where people are wont to assemble*." Considering the rule that words must be given their plain meaning unless otherwise intended, all other buildings can only mean all other buildings where people are wont to assemble. The plain ordinary meaning of those words can only be held to have included the Randolph

Tavern. Such intention is strengthened by the use of the word "whatever" following the words "places of public resort" which is defined as "of no matter what type, degree, quality, etc." Webster's New Twentieth Century Dictionary Unabridged, Second Edition, 1964, p. 2081. "Resort" by the same authority at page 1542 is defined as, "[A] place to which people go often, customarily, or generally; especially, a place to which people go for rest or relaxation, as on a vacation." The second definition is "a frequent, customary, or general going, gathering together, or visiting; as, a place of general resort." These are not technical terms but plain words and in the only authority in which the words have been judicially defined, public resort and a place of public resort have been extended far beyond even these plain definitions. In Cebulek v. Tisone, Ohio, 28 Ohio Law Abst. 166, the Ohio handrail statute was construed. It used the term "place of public resort." It was held to apply to the basement of a building, where the rest room was located, above which there was a restaurant and beer parlor.

In Village of Atwood v. Otter, 296 Ill. 70, 1. c. 84, 129 N.E. 573, a poolroom conducted in the name of an amusement club but to which anyone was admitted on paying a nominal fee entitling him to play a certain number of games was held to be "a place of public resort."

Even more persuasive on this definitional question is Gregorc v. Londoff Cocktail Lounge, Inc., 314 S.W.2d 704 (Mo.Sup. 1958) where a cocktail lounge is held to be a place of public resort.

Thus, either as within the plain terms, *"all other buildings . . . whatever where people are wont to assemble"* or alternatively, as a place of "public resort" the Randolph Tavern is one of the places subject to the statute.

■ Whether the rear door of the main room may be classified as an "exit door" or "door for ingress or egress"

presents a more difficult problem. There is a split of authority as to the construction of fire protection regulations—some courts taking the view that such regulations, being in derogation of the common law, must be strictly construed while others construe them liberally to effect their purposes. 13 Am.Jur.2d, Buildings, § 27. It appears that Missouri takes the latter view. Lauer v. Copaken, 244 S.W.2d 422 (Mo. App.1951) (provision of a building code requiring stairway railings is remedial and should be liberally construed).

In Gross v. Chrysler Sales Corp., 265 App.Div. 661, 40 N.Y.S.2d 194 (N.Y.App. 1943), the court found that a stairway wholly within the amphitheater of the New York World's Fair was not a "means of egress" within the meaning of the building code. The court interpreted the term to mean "any exit from a room, floor, or building." Id. at 196. This case illustrates that interpretation of "means of egress" which could find interior doors within the meaning of such safety regulations. Furthermore, there is foreign authority for the proposition that statutes regulating the use and construction of "means of egress" for public safety are not limited in effect to required exits. Repucci v. Exchange Realty Co., 321 Mass. 571, 74 N.E.2d 14 (1947) (holding that while defendant was not required to provide additional means of escape from fire, if he did so, he must provide it in compliance with statutory requirements). According to the Massachusetts Court:

"The defendant urges, however, that the cantilever was not any portion of a structure required to be built or maintained under the statute, and, in other words, that it was not one of the prescribed 'egresses and means of escape.' We cannot accept the contention that the requirement that the 'egresses and means of escape shall be kept unobstructed, in good repair and ready for use' referred only to the additional egresses ordered by an inspector. Such an interpretation of the statute would establish one stand-ard of workability and repair for fire escapes installed by order of an inspector and another standard, perhaps no standard at all, for those provided without such an order. Here the fire escape in fact had been provided, and irrespective of the existence of other egresses or means of escape there was a duty to be performed that every fire escape so provided should be true to its name and in good working order." Id. at 17.

The imposition of liability for misfeasance where none would exist for nonfeasance is not a new concept in the law of torts. Prosser, Law of Torts, 344 (3rd ed. 1964). While the statute may have imposed no duty to provide a rear exit (at least no duty was asserted in the pleadings), any door provided must be in compliance with the standard of care imposed by statute. If the statute and building code ordinances were applicable to the Randolph Tavern in general and the rear door in particular, then this legislation established the standard of care as to such doors.

Whatever doubt there might be as the language "doors of ingress or egress" is resolved when the subsequent language describing compliance "shall be hung so as to open outwardly from the audience rooms, *halls* or workshops of such buildings or places" is considered. This cannot be read any way but as applying to the single room of the Randolph Tavern and when so read the interior door is plainly included.

Adverting now to defendants Stockton's claim of error in the verdict directing instructions, a maze of procedural difficulty must first be wound through before the issue can be considered on the substantive issues involved.

As noted above, plaintiffs' instruction number 2 submitted the cause against Curtis and number 3 submitted it against defendants Stockton. Variance exists only as to the named defendants. Both of these instructions are alternative and disjunctive submissions of liability on the ordinances

of the city in the second alternative and upon the statute in the first alternative.

■ Defendants Stockton confine their complaint to the first alternative submission. Both submissions, since framed disjunctively, must be valid to uphold the instruction. Feldman v. Lewis, 338 S.W.2d 364 (Mo.App.1960), 1. c. 369. Green v. Guynes, 235 S.W.2d 298 (Mo.Sup.1951), 1. c. 303. Thus, even if defendants Stockton have conceded the point with respect to submission under the ordinances, that will not save the instruction if there be error in submission under the statute.

■ Defendants Stockton by their brief variously urge error in instruction number "2". This is the instruction directing a verdict as to defendants Stockton. The motion for new trial, however, refers only to a claim of error as to instruction number "3" which is the instruction directing a verdict as to the defendant Curtis. Plaintiffs assert the point should not be considered because there is no reference to the instruction attacked in the motion for new trial in violation of Rule 79.03. Conceding that the technical defect of the variance in number may be a slim reed to sustain the verdict, plaintiffs concede for the "sake of argument" that the court may consider the references to the instruction in the motion for new trial as relating to the number 2 instruction applicable to defendants Stockton. With respect to those portions of the complaint which are subject only to the vice of reference to the wrong number in the motion for new trial, the error of misnumbering is not sufficient to deny consideration. Fields v. Kansas City, 383 S.W.2d 543 (Mo.Sup. En Banc 1964). Tenaciously, however, plaintiffs assert that even that assumption will not save portions of the argument of defendants Stockton since even if so considered, the post trial motion did not raise for consideration by the trial court central issues raised in the briefs. The tenacity of counsel is understandable in view of the seriousness of the points attempted to be raised.

The two complaints raised which are subject to the inherent defect of no allegation of error in the motion for new trial are, first, that no finding of control of the premises by defendants Stockton was included in the instruction; and second, that the verdict against only one of the defendants on identical instructions and facts is "inexplicable" and "completely inconsistent."

■ The latter "point" is subject to still another procedural and rule violative defect assiduously noted by plaintiffs. The "point" in the argument portion of the brief is no where mentioned in the "points and authorities" and, in fact, what is set forth in the "points and authorities" under the corresponding number appears no where else in the brief. Normally and properly, the failure to comply with the requirements of assertion of such error in the trial court and its improper briefing would result in a denial of any consideration of the points which are so improperly raised. This is particularly true where no attempt is made to openly acknowledge the defects and brief and argue the points as "plain error" within Rule 79.04. Two reasons impel a consideration of the issues so defectively presented in this case. Counsel on oral argument indicated that other litigation pends on the same facts and legal issues and concede that the basic question concerning liability of either landlord or tenant under Section 320.070 is new in our law.

■ Dealing first with the latter point that the verdict is "inconsistent" and inexplicable, the effect of such inconsistent verdicts must be considered. Only defendants Stockton and plaintiffs are affected by the claim of inconsistency. Plaintiffs have not raised the issue. As noted, there is nothing to review on plaintiffs' appeal. The only basis for a claim of prejudice by defendants Stockton on this point is the loss of the right of contribution arising from a joint verdict. That denial of the right of contribution does not

afford the basis for a claim of error sufficient to overturn plaintiffs' verdict here. A co-defendant cannot predicate reversal on his loss of the right of contribution. Schneider v. Dubinsky Realty, 344 Mo. 654, 127 S.W.2d 691 (1939), 1. c. 695. Phegley v. Graham, 215 S.W.2d 499 (Mo. Sup.1948), 1. c. 504. Barr v. Nafziger Baking Co., 328 Mo. 423, 41 S.W.2d 559 (1931), 1. c. 563.

■ Only when the error in a co-defendant's instruction affects the liability of the appealing defendant may he assert the vice in a co-defendant's instruction. Barr v. Nafziger, supra, 1. c. 563. Phegley v. Graham, supra, 1. c. 503. If this issue were to be raised properly, it would be, by the appropriate post-trial motion of plaintiffs, addressed to the jury verdict in favor of defendant Curtis.

Turning to the first issue, control of the premises, this is posited on defendants Stockton's insistence that Section 320.070 standing alone cannot provide the substantive basis for the submission of their negligence as a matter of law. They insist that it must be read with Section 320.080 which in pertinent part reads as follows:

"Any . . . person or persons . . . who may have charge of the erection, or may have the control or custody of any of the said buildings or places of resort mentioned in Section 320.070 who shall refuse or fail to comply with the provisions of said section within six months from the passage of this law, . . . shall, on proof of such refusal or failure . . . be adjudged to be guilty of a misdemeanor . . . ."

Defendants Stockton's briefed position is that Section 320.070 defines "duty" with respect to such doors and that Section 320.080 indicates who must comply with such duty.

Noting that the verdict directing instruction does not require a finding that failure to provide doors in conformity with the statute is negligence, it must be conceded that the instruction proceeds on a theory of negligence per se or as a matter of law. Missouri has consistently held that a violation of a statute can be negligence per se. State ex rel. State Highway Commission v. Daigh, 464 S.W.2d 524 (Mo.App.1971). This position is consistent with the majority view in the United States which recognizes that the violation of state statutes and municipal ordinances under proper circumstances constitutes negligence as a matter of law. 132 A.L.R. 866, 868.

■ Generally, for a violation to be considered negligence per se, it must appear that: (1) the injured party was within the class sought to be protected by the legislature, and (2) the injury sustained was of such character as the statute or ordinance sought to prevent. Endicott v. St. Regis Investment Co., 443 S.W.2d 122 (Mo.Sup.1969), 1. c. 125. On this basis, the Missouri courts have determined violations of various building safety provisions do constitute negligence as a matter of law. Wells v. Henry W. Kuhs Realty, 269 S.W.2d 761 (Mo.Sup.1954) (decedent injured by falling on broken glass in a "private dump" prohibited by building code). Monsour v. Excelsior Tobacco Co., 115 S.W.2d 219 (Mo.App.1938) (plaintiff injured while using stairs inadequately lighted under building code standards). Wendler v. People's House Furnishing Co., 165 Mo. 527, 65 S.W. 737 (Mo.1901) (employee injured as a result of employer's failure to maintain barriers to an elevator shaft as required by statute). The fact that a properly applicable legislative standard has been breached is generally sufficient to establish negligence per se.

Obviously, the fact that a safety regulation of the requisite class exists is insufficient to impose liability in the absence of a showing that the regulation required action by the particular defendant.

Thus, to so instruct as a matter of law on the basis of the violation of the statute requires not only that the standard of care be legislatively established and the plaintiff

be within its provisions, but also that the defendants be by statute made responsible for failure to observe the mandate of the statute.

Defendants argue that at common law the existence of the lease would have absolved them from liability on this issue of control. They rely heavily on Warner v. Fry, 360 Mo. 496, 228 S.W.2d 729 (1950), in the portion of that case in which Judge Hyde states the general rule as to common law liability, that a landlord is not obligated to repair, absent a contract to do so, because a lease is equivalent to a sale for the term of the lease. That rule is wide of the mark here. The real issue presented is whether the basic statute presents only a legislatively defined standard of care which, if violated, is evidence of negligence or whether it contains a legislative admonition binding on Stocktons as "owners" to comply or be found negligent as a matter of law. Obviously, if the failure to comply with the statute is only evidence of negligence, a finding that such failure was negligence would be required in instructing under it.

Defendants Stockton argued in their brief that since the statute, section 320.080, refers only to the persons who may have the "control or custody" of the buildings mentioned in section 320.070 that the landlord Stockton could not be charged with the duty of compliance. The first branch of their argument relates to the lease which they contend transferred the control and custody to the defendant Curtis, particularly with respect to the "inner" door. As has been noted, reliance is placed upon Warner v. Fry, supra, for support of this argument. Defendants Stockton contend that the ordinary principles of landlord and tenant law deny liability when tenant is in control and has agreed to repair. Plaintiffs did not submit on a common law theory of liability. The submission here is of the violation of the statute and the controlling question is upon whom did the legislature intend to impose liability for the failure to provide proper exit facilities?

Based again on the plain purpose of the statutes—the protection of human life—and the remedial nature of the legislation, the statute should be construed broadly to effect its purpose and prevent the mischief apprehended. To relegate the members of the public to their remedy against the person in "control" under the narrow definitions of landlord and tenant would permit evasion of the salutary purpose, by leases to persons with no financial responsibility, and cause a subversion of the plain purpose of the statute. It would, likewise, result in the anomaly of permitting recoveries where premises were owner occupied and deny recovery where lessees were in possession regardless of the financial responsibility of either. Such joint liability has been extended to protect passers-by on public streets for a mere failure to keep in repair. Walsh v. Southwestern Bell Telephone Co., 331 Mo. 118, 52 S.W.2d 839 (1932), 1. c. 844–845. The positing of the holding in that case on the protection of the public is no less persuasive in this case where the public has been exposed to grave danger from fire and its attendant panic. Such a view comports with the view of the writers of the Restatement Torts 2nd (Sec. 359) and conforms to modern thought and decision.

Defendants Stockton also assert Yall v. Snow, 201 Mo. 511, 100 S.W. 1 (1906) by analogy is authority for the proposition they assert. The defendants Stockton reason that the fire escape statute involved in Yall v. Snow provided in its penalty section for imposition of the penalty on the "owner, proprietor, lessee or manager" of the building and that the court refused the converse of the argument made here by saying that the language of the fire escape act applied to the owner and could not be construed to apply *only* to the person in possession. Defendants Stockton argue that the Yall case thus holds that where words which qualify the nature of the possession, to-wit: control or custody, are used that the legislature intended to apply the act only to the person

in possession of the building. The significant portion of the Yall opinion in which the court was ruling specifically on the validity of the lease for ten years as absolving the owner from liability on the theory that the owner was not in possession and control of the premises and could not be held to the statutory obligation answers that contention, 1. c. 5:

> "We think there is little merit in this assignment in the demurrer. It would have been no violation of the lessees' rights for the defendant to have entered upon the premises and erected the fire escapes which the law commanded both the owner and the tenant to erect. It would have been an act in obedience to a duty to society and the tenants' own guests and employes to protect them from injury by fire."

It appears that this is a more reasonable construction to be given section 320.080. When this statute is viewed in the same light as the statute defining the standards applicable to such exits, to effectuate its plain purpose, it can only be held to apply to any person who has the *right of control* of the building whether he be lessee or owner. Yall v. Snow logically and properly holds that no agreement between the parties may absolve either the landlord or the lessee from the duty imposed by statute for the maintenance of the fire escape under the fire escape statutes; and it seems unquestionably true that the duty, if it devolves upon the landlord and the tenant, is a non-delegable and continuing duty as to both. Burt v. Nichols, 264 Mo. 1, 173 S. W. 681 (1915). Gaines v. Property Servicing Company, 276 S.W.2d 169 (Mo. Sup.1955). Fassi v. Schuler, 349 Mo. 160, 159 S.W.2d 774 (1942)

The reasoning of the court in applying the fire escape law to both landlord and tenant in light of the beneficent aim of the legislation, to protect human life, applies with equal force to those statutes of such common purpose and the duty to provide such doors in the buildings included in its

provisions is by the language control or custody found to be a continuing non-delegable duty.

When so construed and applied no necessity for a finding of "control" exists. The statutes make the violation negligence per se and the court should determine if the statutes apply in a given case and when such application is found as here, the instructions should not submit that issue to a jury determination. The instruction here is not a model in that respect but defendants Stockton cannot complain that the plaintiffs assumed too great a burden. When the statutes are found to be applicable which is a matter of law for the court only the operative facts showing the violation need be submitted. The statute need not be pleaded; Leek v. Dillard, 304 S.W.2d 60 (Mo.App.1957); Jones v. Chicago, B. & Q. R. Co., 343 Mo. 1104, 125 S.W.2d 5 (1938); Lohmeyer v. St. Louis Cordage Co., 214 Mo. 685, 113 S.W. 1108 (1908); and the court will take judicial notice thereof and only the ultimate facts of liability need be found.

Recognizing that what has been declared with respect to the scope and application of Sections 320.070 and 320.080 breaks new ground in Missouri, exhaustive research to find authority in sister states has been undertaken. Although, as noted, all of the states have statutes either imposing a statutory standard with respect to such doors as here involved or a statute delegating to an administrative body the power to provide regulations and standards, no case law exists interpreting such statutes as they apply to doors of egress. Only one case is found even referring to such a statute, The Supreme Court of New Hampshire in Davis v. Nox-All Shoe Co., 85 N.H. 327, 159 A. 126, dealt with a case where the specific ground of negligence alleged was maintenance of inward swinging doors in a factory as a violation of Public Law, Chapter 147, Section 12, Laws of New Hampshire, which provided that in buildings where laborers were employed doors

" . . . shall be so constructed as to open outward when practicable . . . "

There was no discussion of the question of the application of the statute in the opinion. The case went off on the question of insufficient factual basis for finding that the doors were the proximate cause of plaintiff's death.

There are, however, two California cases dealing with the construction of ordinances of the City of Los Angeles. The earlier case, Neuber v. Royal Realty, 86 Cal.App. 2d 596, 195 P.2d 501, was decided in the District Court of Appeal, Second District, in 1948. Insofar as it is applicable to the case at bar, it held that the ordinances relating to the door swinging outward were applicable, but that again there was no evidence that the door was the proximate cause of the injury. Regardless of the basis for the court's holding, the case is of little persuasive force in view of the second California case, Finnegan v. Royal Realty, 35 Cal.2d 409, 218 P.2d 17. That case arose out of the same fire as Neuber, supra.

It was decided by the Supreme Court of California In Bank, in 1950. Under the facts and issues of that case, it is persuasive authority for what has been decided with respect to the Missouri statutes. The litigation involved two plaintiffs, employees of the tenant defendant, the landlord was also a defendant. The verdict was against both defendants and the Supreme Court upheld the verdict. The language of the ordinance which the court applied to both the landlord and the tenant was as follows: "Doors serving as exits shall open only in the direction of exit . . . " 1. c. 20. The facts with respect to the fire disclose that the tenant was in the business of manufacturing dice from nitrocellulose, a highly explosive and flammable substance. The only doors permitting exit from the room in which this substance was in use were double doors swinging inwardly to the room. There was evidence of extreme negligence on the

part of the lessee in the handling and use of the dangerous substance, and when the fire occurred from an unknown cause, the plaintiffs sustained severe injuries while attempting to escape from the room through the inward opening doors. The court specifically held that the ordinance applied to both the landlord and the owner. In discussing the application of that ordinance and another, the court said that it considered the ordinance analogous to those relating to fire escape statutes and ordinances and rejected the lessor's contention that the lessee was the only one held to a duty to provide proper exits. The language [omitting the citation] of cases in which this holding appears, 1. c. 26, is as follows: "In such a case, the obligation of the owner as to third persons is not under the contract with the lessee, but rather under the law, violation of which constitutes negligence . . . Statutes and ordinances prescribing the safety features of buildings impose a duty of compliance upon the property owner. Where such a statute or ordinance fails to designate the person charged with the duty of compliance, the initial responsibility is that of the owner." The landlord specifically urged a provision of the lease which delegated responsibility for compliance with statutes and ordinances, and the court rejected that contention and again relying upon the fire escape cases said, "In such case the duty imposed on the landlord is mandatory and can not be delegated to the tenant, nor to any other entity or person . . . It would seem that this principle is sound in reason. If a landlord may delegate his duty of compliance with safety ordinances and statutes designed for the protection of members of the public rightfully on the premises to persons who may be financially irresponsible, all salutary legislation would soon become a nullity." 1. c. 31–32. This case is soundly reasoned and supports the conclusions herein. There was a dissent in the case, but it turned upon the application of an ordinance requiring two exits and a sprinkler system to the facts of the case and does not affect the issues referred to above.

On the basis of this authority and the analysis of sections 320.070 and 320.080, RSMo 1969, V.A.M.S., set forth above, no basis exists for sustaining defendants Stockton's claim that the instructions were erroneous.

■ By a separate point, defendants Stockton contend the court erred in failing to sustain the defendants Stockton's motion for a directed verdict at the close of *plaintiffs' evidence,* because there was no evidence of "negligence" and because the evidence failed to show that any violation of statutes or ordinances was the proximate cause of plaintiffs' injury. This point raises nothing for review since the defendants Stockton, after adverse ruling, presented evidence. Barber v. Allright Kansas City, Inc., 472 S.W.2d 42 (Mo. App.1971), Garvis v. K Mart Discount Store, 461 S.W.2d 317 (Mo.App.1970).

The point is restated in the same vein in the next point under the claim of error relating to a motion filed at the close of all the evidence. The point argued is that "no submissible issue under the law of landlord and tenant and of proximate cause made a submissible case for a jury." Treating this as a contention that there was no "evidence" to make submissible either of the issues referred to and giving a generous reading to the allegations of the post-trial motion, the point may be considered as presenting the issue of failure on the part of the plaintiff to produce evidence of common law negligence or of proximate causation. The first point is readily determined—no issue of common law negligence was submitted to the jury. The appellants' argument relating to the common law theory of liability has been considered above and what has been said there is of application here.

The second claim of purported error is argued from the assumed premise by defendants Stockton that the statute and ordinance were violated but that the efficient and proximate cause of the decedent's death was the intervening intentional act of Coleman. Defendants Stockton cite cases in which the antecedent acts of negligence are complete and final and *thereafter* an efficient intervening negligent act *causes the injury.* They are readily distinguishable since the negligence and intentional act here concur to cause the injury.

■ As noted heretofore, it is not enough that the plaintiff establish negligence as a matter of law. It must also be established that the defendant's negligent conduct was the legal cause and the cause in fact of the plaintiff's injuries. In Davis v. Nox-All Shoe Company, supra, the New Hampshire Supreme Court held that the plaintiff may have established negligence on the part of the owner of a building for his failure to provide doors that opened outward in accordance with a safety statute; but he failed to show that the death of plaintiff's decedent was caused by the defendant's negligence. The decedent's body was found sixty-eight feet from the door in question; and the court said that it was mere conjecture to assert that the decedent had gone to the door and been unable to open it because of its improper construction. Since no competent proof of the cause in fact had been presented, the jury was not allowed to speculate as to the cause, and no liability could be established. In the instant case, the evidence indicates that the plaintiffs' decedent and others had gone to the door and were piled against the door. It is a reasonable inference that the failure of the door to open outward prevented escape. Such reasonable inferences will support submission of the issue of causation to the jury. Edwards v. Mellen, 366 S.W.2d 317 (Mo.Sup.1963).

■ In most cases legal cause and cause in fact are synonymous. Only where some intervening force is involved is it necessary, in the practical sense, for a determination of proximate cause to be made separate from the jury finding of cause in fact. This case presents such a situation where the intervening acts of an arsonist must be analyzed to determine if the de-

fendant's negligence is "cut off" as the legal cause for the plaintiff's injuries.

The courts in Missouri have been unwilling to follow any mechanical rules when allocating the loss when human forces intervene. After a case analysis, the Supreme Court stated an exception to the general rule of independent intervening forces in Shafir v. Sieben, 233 S.W. 419 (Mo. in Banc, 1921), l. c. 423, as follows:

> "From these and many other Missouri cases bearing more or less directly upon this point, we consider the rule to be well established in this State that where the direct and immediate cause of the injury, although the independent act of a third person, belongs to a class against which the defendant is legally bound to protect the plaintiff as one of the general public, defendant will be liable in damage for such injury for his failure to afford such protection."

Conclusive on this question is a later Missouri case which held the owner of an apartment liable for injuries to an occupant even though the fire was started by an arsonist. Gaines v. Property Servicing Company, 276 S.W.2d 169 (Mo., 1955). By his failure to comply with a statute requiring fire escapes, the landlord had breached his duty to provide for the safety of his tenants. The court said in Gaines, l. c. 173:

> "The purpose of the statute is evident from its provisions and we find no basis for limiting the protection offered thereby to only such fires as may have had their origin in accident or negligence. We cannot approve any classification based upon the origin of the fire and must hold that under the provisions of the applicable statutes it is wholly immaterial whether the fire in question had its origin in accident, act of God, negligence or wilful, intentional and wrongful conduct."

The facts here are clearly analogous to the Gaines decision; and the issue of proximate causation must be resolved in favor of the plaintiffs for that reason.

The judgment for plaintiffs is affirmed.

SHANGLER, C. J., and CROSS, J., concur.

SWOFFORD, PRITCHARD and WASSERSTROM, JJ., not participating because not members of the court when cause was submitted.